## COSTELLO v. UNITED STATES.

No. 59.   Argued December 12, 1960.—Decided February 20, 1961.

*Edward Bennett Williams* argued the cause for petitioner. With him on the briefs were *Agnes A. Neill* and *Morris Shilensky.*

*Wayne G. Barnett* and *Ralph S. Spritzer* argued the cause for the United States. On the briefs were *Solicitor General Rankin, Assistant Attorney General Wilkey, Beatrice Rosenberg* and *Eugene L. Grimm.*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

The petitioner became a naturalized citizen on September 10, 1925. The District Court for the Southern District of New York revoked his citizenship on March 9, 1959, in this proceeding brought by the Government under § 340 (a) of the Immigration and Nationality Act of 1952. That Act authorizes revocation of natu-

ralized citizenship "on the ground that such order and certificate of naturalization were procured by concealment of a material fact or by willful misrepresentation . . . ."[1] The petitioner, in 1925, swore in his Preliminary Form for Naturalization, in his Petition for Naturalization, and when he appeared before a Naturalization Examiner, that his occupation was "real estate." The District Court found that this was "willful misrepresentation and fraud" and that "his true occupation was bootlegging," 171 F. Supp. 10, 16. The Court of Appeals for the Second Circuit affirmed, 275 F. 2d 355. We granted certiorari. 362 U. S. 973.

An earlier denaturalization complaint brought under 8 U. S. C. (1946 ed.) § 738 (a), the predecessor of § 340 (a), was dismissed on the ground that wiretapping may have infected both the Government's affidavit of good cause and its evidence. *United States* v. *Costello,* 145 F. Supp. 892. The Court of Appeals for the Second Circuit reversed on the ground that the Government should have been afforded an opportunity to show that its evidence either was untainted or was admissible

---

[1] The statute, 66 Stat. 260, as amended, 68 Stat. 1232; 8 U. S. C. § 1451, reads in pertinent part as follows:

"(a) *Concealment of material evidence; refusal to testify.*

"It shall be the duty of the United States attorneys for the respective districts, upon affidavit showing good cause therefor, to institute proceedings in any court specified in subsection (a) of section 1421 of this title in the judicial district in which the naturalized citizen may reside at the time of bringing suit, for the purpose of revoking and setting aside the order admitting such person to citizenship and canceling the certificate of naturalization on the ground that such order and certificate of naturalization were procured by concealment of a material fact or by willful misrepresentation, and such revocation and setting aside of the order admitting such person to citizenship and such canceling of certificate of naturalization shall be effective as of the original date of the order and certificate, respectively: . . . ."

in any event. 247 F. 2d 384. We granted certiorari and reversed, 356 U. S. 256, on a ground not considered below, namely, that the affidavit of good cause, which is a prerequisite to the initiation of denaturalization proceedings under § 340 (a), *United States* v. *Zucca,* 351 U. S. 91, was not filed with the complaint. On remand the District Court declined to enter an order of dismissal "without prejudice" and entered an order which did not specify whether the dismissal was with or without prejudice. The Government did not appeal from that order but brought this new proceeding under § 340 (a) by affidavit of good cause and complaint filed on May 1, 1958.

The petitioner argues several grounds for reversal of the order revoking his citizenship. He contends: (1) that the finding that he willfully misrepresented his occupation is not supported by clear, unequivocal, and convincing evidence, the standard of proof required of the Government in these cases; (2) that some of his admissions as to his true occupation at the time of his naturalization were tainted by wiretapping, and thus were not evidence which the District Court might rely upon in reaching its conclusion; (3) that in the circumstances of this case the lapse of 27 years from the time of the petitioner's naturalization to the time of the filing in 1952 of the Government's first complaint should be deemed to bar the Government from instituting this proceeding; (4) that the second denaturalization proceeding was barred under Rule 41 (b) of the Federal Rules of Civil Procedure by the failure of the District Court on remand of the first proceeding to specify that the dismissal was "without prejudice" to the filing of a new complaint.

We find no merit in any of these contentions.[2] The judgment of the Court of Appeals will be affirmed.

[2] The District Court also found that the petitioner knowingly and willfully swore false allegiance to the Constitution and laws of the United States. Like the Court of Appeals, 275 F. 2d, at 360, we find

## I.

The Government carries a heavy burden of proof in a proceeding to divest a naturalized citizen of his citizenship. American citizenship is a precious right. Severe consequences may attend its loss, aggravated when the person has enjoyed his citizenship for many years. See *Schneiderman* v. *United States*, 320 U. S. 118, 122–123; *Nowak* v. *United States*, 356 U. S. 660, 663. In *Chaunt* v. *United States*, 364 U. S. 350, 352–353, we said:

"Acquisition of American citizenship is a solemn affair. Full and truthful response to all relevant questions required by the naturalization procedure is, of course, to be exacted, and temporizing with the truth must be vigorously discouraged. Failure to give frank, honest, and unequivocal answers to the court when one seeks naturalization is a serious matter. Complete replies are essential so that the qualifications of the applicant or his lack of them may be ascertained. Suppressed or concealed facts, if known, might in and of themselves justify denial of citizenship. Or disclosure of the true facts might have led to the discovery of other facts which would justify denial of citizenship.

"On the other hand, in view of the grave consequences to the citizen, naturalization decrees are not lightly to be set aside—the evidence must indeed be 'clear, unequivocal, and convincing' and not leave 'the issue . . . in doubt.' *Schneiderman* v. *United States*, 320 U. S. 118, 125, 158; *Baumgartner* v. *United States*, 322 U. S. 665, 670. The issue in these cases is so important to the liberty of the citizen that

it unnecessary to pass upon the petitioner's attack upon this finding, since we think that the revocation of his citizenship on the first ground was clearly correct.

the weight normally given concurrent findings of two lower courts does not preclude reconsideration here . . . ."

In 1925 a known bootlegger would probably not have been admitted to citizenship. Decisions before and after the repeal of the Eighteenth Amendment held that the applicant who trafficked in the sale, manufacture, or transportation of intoxicating liquors during Prohibition, within the five years preceding his application, did not meet the statutory criterion that an applicant must have behaved as a person "of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the same." Act of 1906, § 4, 34 Stat. 596, 598.

In *United States* v. *De Francis*, 60 App. D. C. 207, 208, 50 F. 2d 497, 498, the Court of Appeals for the District of Columbia stated, "Any person who violates the provisions of the Prohibition Act violates the principles of the Constitution of the United States, and cannot be held to be attached to the principles of the Constitution of the United States. Nor can it be said that such a person possesses good moral character."

In *Turlej* v. *United States*, 31 F. 2d 696, 699, it was said, "Few cases can be found where applicants for citizenship have been admitted, if guilty of violating liquor laws within the five years preceding the hearing, and such cases have been severely criticized by the courts. This was true even before the adoption of the Eighteenth Amendment as a part of our national Constitution." See also *In re Trum*, 199 F. 361.

In *United States* v. *Villaneuva*, 17 F. Supp. 485, 487, the court said, "Courts have quite universally held that violations of prohibition liquor laws, whether national or state, should be taken into consideration in determining questions respecting the good moral character of appli-

cants for citizenship and their attachment to the principles of the Constitution of the United States."

In *United States* v. *Mirsky,* 17 F. 2d 275, a denaturalization case, Judge Thacher of the District Court for the Southern District of New York, who had admitted Costello to citizenship less than a year earlier, said: "One who deliberately violates the Eighteenth Amendment of the Constitution cannot be said to be attached to the principle declared by that amendment." P. 275. "Neither the fact that in this and in other communities there are many citizens who are not attached in thought or deed to the principle embodied in the Constitution by the Eighteenth Amendment, nor the fact that opposition to that principle with a view to removing it from the Constitution is quite generally thought to be the part of good citizenship, can relieve this court of its duty to apply the law as it is now written." P. 276.

See also *In re Nagy,* 3 F. 2d 77; *In re Raio,* 3 F. 2d 78; *In re Phillips,* 3 F. 2d 79; *In re Bonner,* 279 F. 789; *Ex parte Elson,* 299 F. 352.

Some of these cases turned on a finding of illegal procurement of the certificate because of demonstrated lack of attachment to the principles of the Constitution rather than upon "fraud" under 8 U. S. C. (1946 ed.) § 738 (a).[3]

---

[3] Section 340 (a) authorizes denaturalization on the single ground of "concealment of a material fact or . . . willful misrepresentation." Its predecessors, § 338 (a) of the Nationality Act of 1940, and § 15 of the original Act of Congress in 1906 giving statutory basis for denaturalization, authorized denaturalization for "fraud" or illegal procurement. The change from "fraud" to "concealment of a material fact or . . . willful misrepresentation" apparently was made primarily to remove doubt as to whether denaturalization could be based on so-called "intrinsic" fraud, fraud through false swearing in the naturalization proceedings, or only on the traditional equity ground for cancellation of a judgment, "extrinsic" fraud, inhering in activities collateral to the proceedings themselves such as the

However, the cases demonstrate the materiality of the concealment by the petitioner of his bootlegging if that in fact was his true occupation. Such concealment would support the conclusion that he was an applicant who had "[s]uppressed or concealed facts . . . [which] . . . if known, might in and of themselves justify denial of citizenship." *Chaunt* v. *United States, supra,* at 352–353.

We have examined the record to determine if the evidence leaves "the issue in doubt," *Schneiderman* v. *United States,* 320 U. S. 118, 158, whether the petitioner procured his naturalization by willfully misrepresenting that his occupation was real estate. It does not. However occupation is defined, whether in terms of primary source of income, expenditure of time and effort, or how the petitioner himself viewed his occupation, we reach the conclusion that real estate was not his occupation and that he was in fact a large-scale bootlegger.

The Government built its case on a solid foundation of admissions made by the petitioner in several federal

concealment of witnesses from the court. Certain lower court cases had indicated that only extrinsic fraud might be encompassed within the term, compare *United States* v. *Kusche,* 56 F. Supp. 201, with *United States* v. *Hauck,* 155 F. 2d 141, in accordance with the rule that had apparently been applied to revocation of a judgment admitting to citizenship prior to the Act of 1906, see *United States* v. *Gleeson,* 90 F. 778; cf. *United States* v. *Norsch,* 42 F. 417. Congress thus acted in 1952 to make it clear that false statements in the course of the naturalization proceedings could be the basis for revocation of citizenship. See S. Rep. No. 1515, 81st Cong., 2d Sess. 756–769. But there appears to be no congressional purpose to lay down a looser definitional standard for "willful misrepresentation" or laxer requirements of proof than had previously been applied by the courts which held misstatements during naturalization proceedings to constitute fraud under the prior statutes. The practice of the Immigration and Naturalization Service apparently treated "fraud" under the older Acts as involving willful misrepresentation or concealment of material facts. See S. Rep. No. 1515, 81st Cong., 2d Sess. 756.

and New York State inquiries beginning in 1938. In that year he admitted to a Special Agent of the Bureau of Internal Revenue that he had engaged in the illicit liquor business from 1923 or 1924 until a year or two before the repeal of the Eighteenth Amendment in 1933. In 1939 he testified before a federal grand jury in the Southern District of New York that "I did a little bootlegging. . . . The last time was around 1926." In 1943 he testified before a New York County grand jury that he had been in the liquor business in the twenties and had an office at 405 Lexington Avenue, New York City, as early as 1925. He also admitted that he had reported an aggregate income of $305,000 for New York State income tax purposes for the years 1919 to 1932 and that "[m]aybe most of it" was earned in the bootlegging business. Indeed, except for $25,000 realized from a real estate venture to be discussed shortly, there was no evidence of income from any legitimate business. In 1943, in a proceeding before an Official Referee of the Appellate Division of the Supreme Court of New York, he acknowledged that money he had lent to Arnold Rothstein, prior to the latter's murder in 1928, might have been derived "from a little bootlegging"; he also admitted that during the Prohibition era his business of smuggling alcoholic liquors into the United States was "profitable." In 1947 he appeared before the New York State Liquor Authority and testified that from 1923 to 1926 he operated a bootlegging business from 405 Lexington Avenue.

Several of his associates in bootlegging enterprises presented a picture of large-scale operations by the petitioner from early in Prohibition past the time of his application for citizenship. Emanuel Kessler, a big operator apprehended in 1923 and convicted for his activities, financed, about 1921, the petitioner's purchase of trucks to haul Kessler's liquors after Kessler landed them on Long Island

from boats on the high seas. Kessler "very often" discussed shipments with the petitioner in telephone calls to the Lexington Avenue office. Kessler's volume at the time was about 3,000 cases per week and he paid the Costello organization approximately $6,000 a week for haulage and storage. Kessler said that before he began serving his sentence "Frank Costello personally asked me . . . for some money so he could continue on. I think I left him either 100 or 200 cases."

Frank Kelly, who began bootlegging about 1922, smuggled liquors into the country using a chartered ship which he moored off the Long Island shore. He became associated with the petitioner in 1925 when he was introduced to the petitioner and the petitioner's Canadian representative, Harry Sausser, at Montauk, Long Island. On this occasion, Sausser negotiated with Kelly for the storage of liquors on Kelly's boat. Kelly was one of a combine including the petitioner which was indicted in 1925 for conspiracy to violate the liquor laws.

Philip Coffey, also indicted with the petitioner in 1925, was a former Kessler employee. He purchased liquor from the Costello organization at 405 Lexington Avenue as early as 1922 or 1923. He insisted that he did "all my business with Eddie Costello," the petitioner's brother, but admitted placing orders with Edward in the petitioner's presence and discussing purchases with the petitioner. Coffey told of an occasion, which he thought occurred in 1925, when Kelly and the petitioner came by automobile to Montauk Point and Kelly gave him instructions for the removal of liquor from Kelly's chartered schooner. He said that he was paid for his services at petitioner's Lexington Avenue office by Edward Ellis, the petitioner's bookkeeper.

Albert Feldman, another admitted bootlegger, started in 1920 and dealt with both the petitioner and Kessler. He arranged with the petitioner about 1923 at the

Lexington Avenue office to have the petitioner haul and store some liquor for him. He also talked with the petitioner regarding its sale. The petitioner told Feldman he had "a customer for the 1000 cases," that he "could sell them and he would be able to pay me in a few days, as soon as they were delivered, to which I agreed; and Frank said that 'I'll be responsible for the money.'" In regard to the petitioner's role in liquor transactions, Feldman said, "everything was Frank Costello. He was the business man. He did all the business."

Helen L. Sausser, daughter of Harry Sausser, was 18 when she became acquainted with the petitioner in 1925. Sausser was one of the two persons who executed the affidavit attached to the petitioner's Petition for Naturalization and swore that he also was in the real estate business. The daughter recalled overhearing conversations between petitioner and her father about liquor, and said that her father admitted to her mother that he was engaged in bootlegging. The daughter testified that she had never known her father to engage in the real estate business.

Despite these strong proofs of the falsity of the petitioner's answers, the petitioner insists that the evidence derived from the Government's own investigation of his activities in the real estate business should leave us with a troubling doubt whether he stated falsely that he was engaged in that occupation. He had told the New York grand jury in 1943, when asked what "other occupation" besides bootlegging he followed during Prohibition, that "I was doing a little real estate at that time." The Government put in evidence in this proceeding state corporate records and records from the Registries of Deeds in New York City. These show that petitioner was indeed identified with three corporations empowered to engage in the purchase and sale of real estate. We dismiss two of the corporations, organized in 1926, without further men-

tion beyond the fact that the petitioner testified before the Official Referee in the Appellate Division that his investment of $25,000 or $30,000 in one of them came from "bootlegging or gambling"; there was no evidence of any real estate transactions involving either company. The petitioner's contention must therefore be tested in the light of the activities of Koslo Realty Corporation. This corporation was organized in December 1924 and at least as early as August 1925 listed its address as the petitioner's office, 405 Lexington Avenue. A December 1925 document lists the petitioner as president of the company. The only evidence of any investment by the petitioner or profitable transaction in which he engaged before May 1, 1925, when he filed his Petition for Naturalization, concerned a property at West End Avenue and 92d Street, Manhattan, acquired by the corporation in December 1924. The petitioner admitted before the New York County grand jury that his investment in that transaction was from earnings in "gambling or liquor" and claimed that he made a profit of $25,000 on the sale of the property in June 1925. The only other transactions occurred after May 1, 1925. The corporation bought lots in the Bronx in August and October 1925. Some of the lots were improved and all of them were sold in 1926.

These proofs raise no troubling doubt in our minds. They do not support an inference that his occupation was real estate. They show only that the petitioner invested his illicit earnings in real estate transactions with the hope of profit. But he was neither deriving his principal income from Koslo Realty Corporation, spending any appreciable time conducting its affairs, nor making it his central business concern. He himself admitted that he operated his bootlegging enterprises from the Lexington Avenue address. All of the witnesses who testified to activities at that address recounted bootlegging transactions and not one in real estate. And the postman who

delivered mail to the office from 1924 to 1926, and saw the petitioner there several times a week, saw neither a secretary nor a typewriter as might be expected in an active real estate business.

The Government's proofs show not merely that the petitioner's statements were factually incorrect, but show clearly, unequivocally, and convincingly that the statements were willfully false. The petitioner argues that the evidence is susceptible of the inference that he may have believed that the questions called for the disclosure only of a legal occupation. We may assume that "occupation" can be a word of elusive content in some circumstances, like the question involved in *Nowak* v. *United States, supra,* and *Maisenberg* v. *United States,* 356 U. S. 670, upon which decisions the petitioner relies. But that argument of ambiguity is farfetched here. No one in the petitioner's situation could have reasonably thought that the questions could be answered truthfully as they were. It would have been a palpable absurdity for him to think that his occupation was real estate; he actually had no legal occupation. On this record, his only regular and continuing concern was his bootlegging upon which he depended for his livelihood. He only dabbled in real estate and by his own admission financed even this sideline from "liquor or gambling." We need not determine whether the evidence supports the conclusion that petitioner organized Koslo Realty Corporation to provide him with a façade or front to mislead the law-enforcement authorities as to his true occupation, although the appearance of a legitimate occupation was obviously convenient for him and his group. We are convinced, however, that the petitioner counted upon the corporation to give plausibility to his representation as to his occupation when he applied for citizenship.

Our conclusion that his representations were willfully false is reached without reliance upon an inference from

the failure of the petitioner to take the stand in this proceeding and testify in his own behalf. The Court of Appeals made some comments as to the significance of the petitioner's failure to testify, 275 F. 2d, at 358, but we do not read its opinion as basing the affirmance of the District Court's order upon such an inference. The district judge, whose order the Court of Appeals affirmed, made none. The evidence so strongly supports the District Court's conclusion that the aid of the inference was unnecessary to buttress it. We therefore find it unnecessary to decide in this case whether an inference may be drawn in a denaturalization proceeding from the failure of the defendant to present himself as a witness.

## II.

The contention that illegal wiretapping precluded reliance upon the petitioner's admissions rests primarily upon interrogations by New York County District Attorney Frank Hogan in 1943 when the petitioner appeared before the New York County grand jury and the Official Referee in the Appellate Division. State officers had a tap on the petitioner's telephone during several months of 1943. Mr. Hogan made frequent references to the tapped conversations when questioning the petitioner. The petitioner claims that his admissions of bootlegging activities during Prohibition were impelled by the belief that Mr. Hogan had learned from the tapped conversations the information sought by the questions. It is argued that the wiretaps were illegal under our decision in *Benanti* v. *United States,* 355 U. S. 96, and that his admissions were therefore to be excluded from evidence as "fruit of the poisonous tree," on the reasoning in *Silverthorne Lumber Co.* v. *United States,* 251 U. S. 385, and *Nardone* v. *United States,* 308 U. S. 338.

The short answer to this contention is that we conclude from the record that his truthful answers to Mr.

Hogan's questions were not given because he thought that the conversations tapped in 1943 revealed his activities in the Prohibition era, but because he realized that these facts had been known to the authorities for some time. None of Mr. Hogan's questions even implies that Mr. Hogan gained his information from the 1943 wiretaps. Mr. Hogan had a transcript of the 1939 federal grand jury minutes of the petitioner's appearance before that body. The petitioner presses no argument in this Court that his admissions before that grand jury were infected with wiretapping. Early in Mr. Hogan's examination, the petitioner admitted that he recalled being questioned before the grand jury in 1939. The questioning at that proceeding had elicited the petitioner's admission of his bootlegging. Furthermore, his arrest and trial under the 1925 indictment for conspiracy to violate the liquor laws were matters of public record. And in 1938 the petitioner had also admitted his bootlegging to the agent for the Bureau of Internal Revenue. It is plain common sense to conclude that this information, long a matter of official knowledge, not something which he thought might have been disclosed in the 1943 wiretaps, impelled the petitioner to answer Mr. Hogan truthfully.

Moreover, District Attorney Hogan testified in the present proceeding. He expressly disavowed that his questions of the petitioner as to his activities during Prohibition were based on the 1943 wiretaps. He testified that his information was derived from files of the District Attorney's office, newspaper reports and court records. Although one of the intercepted telephone conversations was between the petitioner and one O'Connell, a codefendant in the 1925 Prohibition prosecution, Mr. Hogan stated that none of the 1943 wiretaps concerned the petitioner's bootlegging activities. The 1943 grand jury and Appellate Division investigations were concerned only

with the petitioner's part in the nomination that year of a candidate for Justice of the State Supreme Court.

It is true that the 1943 wiretaps prompted the calling of the petitioner before the county grand jury and the Official Referee. But the "fruit of the poisonous tree" doctrine excludes evidence obtained from or as a consequence of lawless official acts, not evidence obtained from an "independent source." *Silverthorne Lumber Co.* v. *United States, supra,* at 392. We said in *Nardone* v. *United States,* 308 U. S. 338, 341, "Sophisticated argument may prove a causal connection between information obtained through illicit wire-tapping and the Government's proof. As a matter of good sense, however, such connection may have become so attenuated as to dissipate the taint." We are satisfied that any knowledge in Mr. Hogan's possession which impelled the petitioner to answer truthfully came from such independent sources and that any connection between the wiretaps and the admissions was too attenuated to require the exclusion of the admissions from evidence.[4]

---

[4] The petitioner makes reference to the opinion of the District Court rendered upon the dismissal of the first complaint. That opinion rested the conclusion that the affidavit of good cause and the evidence were infected with wiretapping partly upon wiretaps said to have been made in the 1920's. The district judge found "indications of the extensive use of wire taps covering a period of·many years and beginning in the 1920's." 145 F. Supp., at 894. However, the district judge in this proceeding heard the testimony of two former Assistant United States Attorneys who conducted the investigation leading to the petitioner's indictment in 1925. The district judge "accepted as true" their testimony "that the Government's information as to the bootlegging activities of Costello was not derived from telephone conversations but was derived from statements of certain individuals acquainted with the defendant's activities." 171 F. Supp., at 25. We see no basis for disturbing this finding and the District Court's conclusion that no taint from wiretaps in the 1920's infected the later admissions made by the petitioner.

### III.

In contending that lapse of time should be deemed to bar the Government from instituting this proceeding, the petitioner argues that the doctrine of laches should be applied to denaturalization proceedings, and that in any event, the delay of 27 years before bringing denaturalization proceedings denied him due process of law in the circumstances of the case.

It has consistently been held in the lower courts that delay which might support a defense of laches in ordinary equitable proceedings between private litigants will not bar a denaturalization proceeding brought by the Government. See *United States* v. *Ali,* 7 F. 2d 728; *United States* v. *Marino,* 27 F. Supp. 155; *United States* v. *Cufari,* 120 F. Supp. 941, reversed on other grounds, 217 F. 2d 404; *United States* v. *Parisi,* 24 F. Supp. 414; *United States* v. *Brass,* 37 F. Supp. 698; *United States* v. *Spohrer,* 175 F. 440; *United States* v. *Reinsch,* 50 F. Supp. 971, reversed on other grounds, 156 F. 2d 678; *United States* v. *Schneiderman,* 33 F. Supp. 510, reversed on other grounds, 320 U. S. 118. These cases have applied the principle that laches is not a defense against the sovereign. The reason underlying the principle, said Mr. Justice Story, is "to be found in the great public policy of preserving the public rights, revenues, and property from injury and loss, by the negligence of public officers." *United States* v. *Hoar,* 26 Fed. Cas. 329, 330 (No. 15,373). This Court has consistently adhered to this principle. See, for example, *United States* v. *Kirkpatrick,* 9 Wheat. 720, 735–737; *United States* v. *Knight,* 14 Pet. 301, 315; see also *United States* v. *Summerlin,* 310 U. S. 414, 416; *Board of County Commissioners* v. *United States,* 308 U. S. 343, 351; *United States* v. *Thompson,* 98 U. S. 486, 489.

None of the cases in this Court considered the question of the application of laches in a denaturalization proceeding. However, even if we assume the applicability of laches, we think that the petitioner failed to prove both of the elements which are necessary to the recognition of the defense. Laches requires proof of (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense. See *Galliher* v. *Cadwell*, 145 U. S. 368, 372; *Southern Pacific Co.* v. *Bogert*, 250 U. S. 483, 488–490; *Gardner* v. *Panama R. Co.*, 342 U. S. 29, 31.

The petitioner alleges lack of diligence in the Government's failure to proceed to revoke his certificate within a reasonable time after his arrest and trial under the 1925 indictment for conspiracy to violate the Prohibition laws, or at least within a reasonable time after his admissions before the federal grand jury in 1939. There is no necessity to determine the merits of this argument, for the record is clear that the petitioner was not prejudiced by the Government's delay in any way which satisfies this requisite of laches. In *Brown* v. *County of Buena Vista*, 95 U. S. 157, 161, this Court said: "The law of laches, like the principle of the limitation of actions, was dictated by experience, and is founded in a salutary policy. The lapse of time carries with it the memory and life of witnesses, the muniments of evidence, and other means of proof." Insofar as these factors inherent in the lapse of time were operative in the present case, they seem plainly to have worked to petitioner's benefit, not to his detriment. The evidence of the petitioner's real estate activity consisted almost exclusively of public records. There is no suggestion that these records are not all the evidence of real estate activity there is or that any had been destroyed or were unavailable. Nor do we perceive any prejudice to the petitioner in the fact that the Naturaliza-

tion Examiners who processed his application, the witnesses who appeared for him, and the judge who admitted him to citizenship, are dead. The examiners and the judge obviously could supply no evidence bearing on his claim that real estate was his occupation. Their knowledge on that subject came from him. And it stretches credulity to suppose that he would have inquired of those officials whether "occupation" meant lawful occupation. Finally, the petitioner does not suggest how the witnesses who supported his petition could have aided him on any issue material in this proceeding. In addition, his bootlegging associate, Sausser, died in 1926, and would not have been available even had the Government brought a proceeding immediately after the criminal trial.

Indeed, any harm from the lapse of time was to the Government's case. Although that case was supported primarily by documentary proofs and the petitioner's admissions, the Government supplemented this evidence with the testimony of the petitioner's associates in the bootlegging enterprise, and of others who had knowledge of those events. The Government's proof was made more difficult when a number of the witnesses admitted that their memories of details had dimmed with the passage of the years.

We cannot say, moreover, that the delay denied the petitioner fundamental fairness. He suffered no prejudice from any inability to prove his defenses. Rather, the harm he may suffer lies in the harsh consequences which may attend his loss of citizenship. He has been a resident of the United States for over 65 years, since the age of four. We may assume that he has built a life in reliance upon that citizenship. But Congress has not enacted a time bar applicable to proceedings to revoke citizenship procured by fraud. On this record, the petitioner never had a right to his citizenship. Depriving

him of his fraudulently acquired privilege, even after the lapse of many years, is not so unreasonable as to constitute a denial of due process. Cf. *Johannessen* v. *United States*, 225 U. S. 227, 242–243.

## IV.

The petitioner moved for leave to amend his petition for a writ of certiorari to add a question whether the present proceeding was barred by the order of the District Court dismissing the earlier proceeding on remand, without specifying whether the dismissal was with or without prejudice. We deferred decision on the motion pending oral argument. The motion is granted and we proceed to determine the merits of the question.

It is the petitioner's contention that the order dismissing the earlier complaint must be construed to be with prejudice because it did not specify that it was without prejudice, and the ground of dismissal was not within one of the exceptions under Rule 41 (b) of the Federal Rules of Civil Procedure. That Rule provides:

> "For failure of the plaintiff to prosecute or to comply with these rules or any order of court, a defendant may move for dismissal of an action or of any claim against him. After the plaintiff has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. . . . Unless the court in its order for dismissal otherwise specifies, a dismissal under this subdivision and any dismissal not provided for in this rule, other than a dismissal for lack of jurisdiction or for improper venue, operates as an adjudication upon the merits."

We hold that a dismissal for failure to file the affidavit of good cause is a dismissal "for lack of jurisdiction," within the meaning of the exception under Rule 41 (b). In arguing contra, the petitioner relies on cases which hold that a judgment of denaturalization resulting from a proceeding in which the affidavit of good cause was not filed is not open to collateral attack on that ground. *Title* v. *United States,* 263 F. 2d 28; *United States* v. *Failla,* 164 F. Supp. 307. We think that petitioner misconceives the scope of this exception from the dismissals under Rule 41 (b) which operate as adjudications on the merits unless the court specifies otherwise. It is too narrow a reading of the exception to relate the concept of jurisdiction embodied there to the fundamental jurisdictional defects which render a judgment void and subject to collateral attack, such as lack of jurisdiction over the person or subject matter. We regard the exception as encompassing those dismissals which are based on a plaintiff's failure to comply with a precondition requisite to the Court's going forward to determine the merits of his substantive claim. Failure to file the affidavit of good cause in a denaturalization proceeding falls within this category. *United States* v. *Zucca, supra; Costello* v. *United States,* 356 U. S. 256.

At common law dismissal on a ground not going to the merits was not ordinarily a bar to a subsequent action on the same claim. In *Haldeman* v. *United States,* 91 U. S. 584, 585–586, which concerned a voluntary nonsuit, this Court said, "there must be at least one decision on a *right* between the parties before there can be said to be a termination of the controversy, and before a judgment can avail as a bar to a subsequent suit. . . . There must have been a right adjudicated or released in the first suit to make it a bar, and this fact must appear affirmatively." A similar view applied to many dismissals on the motion

of a defendant. In *Hughes* v. *United States,* 4 Wall. 232, 237, it was said: "In order that a judgment may constitute a bar to another suit, it must be rendered in a proceeding between the same parties or their privies, and the point of controversy must be the same in both cases, and must be determined on its merits. If the first suit was dismissed for defect of pleadings, or parties, or a misconception of the form of proceeding, or the want of jurisdiction, or was disposed of on any ground which did not go to the merits of the action, the judgment rendered will prove no bar to another suit." See also *House* v. *Mullen,* 22 Wall. 42, 46; *Swift* v. *McPherson,* 232 U. S. 51, 56; *St. Romes* v. *Levee Steam Cotton Press Co.,* 127 U. S. 614, 619; *Burgett* v. *United States,* 80 F. 2d 151; *Gardner* v. *United States,* 71 F. 2d 63.

We do not discern in Rule 41 (b) a purpose to change this common-law principle with respect to dismissals in which the merits could not be reached for failure of the plaintiff to satisfy a precondition. All of the dismissals enumerated in Rule 41 (b) which operate as adjudications on the merits—failure of the plaintiff to prosecute, or to comply with the Rules of Civil Procedure, or to comply with an order of the Court, or to present evidence showing a right to the relief on the facts and the law—primarily involve situations in which the defendant must incur the inconvenience of preparing to meet the merits because there is no initial bar to the Court's reaching them. It is therefore logical that a dismissal on one of these grounds should, unless the Court otherwise specifies, bar a subsequent action. In defining the situations where dismissals "not provided for in this rule" also operate as adjudications on the merits, and are not to be deemed jurisdictional, it seems reasonable to confine them to those situations where the policy behind the enumerated grounds is equally applicable. Thus a *sua sponte* dismissal by the Court for failure of the plaintiff to comply

with an order of the Court should be governed by the same policy. Although a *sua sponte* dismissal is not an enumerated ground, here too the defendant has been put to the trouble of preparing his defense because there was no initial bar to the Court's reaching the merits. See *United States* v. *Procter & Gamble Co.*, 356 U. S. 677, 680, and footnote 4; *American Nat. Bank & Trust Co.* v. *United States,* 79 U. S. App. D. C. 62, 142 F. 2d 571.[5]

In contrast, the failure of the Government to file the affidavit of good cause in a denaturalization proceeding does not present a situation calling for the application of the policy making dismissals operative as adjudications on the merits. The defendant is not put to the necessity of preparing a defense because the failure of the Government to file the affidavit with the complaint requires the dismissal of the proceeding. Nothing in the term "jurisdiction" requires giving it the limited meaning that the petitioner would ascribe to it. Among the terms of art in the law, "jurisdiction" can hardly be said to have a fixed content. It has been applied to characterize other prerequisites of adjudication which will not be re-exam-

---

[5] The inapplicability of the policy of the rule to other dismissals for failure to meet a precondition of adjudication has been recognized. The Advisory Committee on Amendments to the Federal Rules recommended in 1955 the addition of another specific exception, for dismissals for "lack of an indispensable party." Although the proposal was not adopted, one commentator has written:

"Undoubtedly a dismissal for lack of an indispensable party should be a dismissal without prejudice since the dismissal proceeds on the theory that his presence is required in order that the court may make an adjudication equitable to all persons involved. . . . The Committee's proposal would, however, take care of the situation where the court did not specifically provide that the dismissal was without prejudice; and thus expressly provide a result which the courts, of necessity, would have to reach even if the dismissal did not specify that it was without prejudice." 5 Moore, Federal Practice, 1959 Cum. Supp., p. 38.

ined in subsequent proceedings and must be brought into controversy in the original action if a defendant is to litigate them at all. See, *e. g., Des Moines Navigation & R. Co.* v. *Iowa Homestead Co.,* 123 U. S. 552 (diversity of citizenship); *In re Sawyer,* 124 U. S. 200, 220–221 (jurisdictional amount). See generally *Noble* v. *Union River Logging R. Co.,* 147 U. S. 165, 173–174. Decisions in the lower courts applying the exception construe "jurisdiction" to encompass dismissals on grounds similar to that in the present case. See *Madden* v. *Perry,* 264 F. 2d 169; *Myers* v. *Westland Oil Co.,* 96 F. Supp. 667, reversed on other grounds, 181 F. 2d 371. We therefore hold that the Government was not barred from instituting the present proceeding.

*Affirmed.*

MR. JUSTICE HARLAN took no part in the consideration or decision of this case.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK concurs, dissenting.

I do not think "bootlegging" *per se* would have been a ground for denying naturalization to an alien in the 1920's. If it were, it would be an act of hypocrisy unparalleled in American life. For the "bootlegger" in those days came into being because of the demand of the great bulk of people in our communities—including lawyers, prosecutors, and judges—for his products. However that may be, the forms of naturalization in use at the time did not ask for disclosure of all business activities of an applicant or of all sources of income. If that had been asked and if only one source of income were disclosed, then there would be a concealment relevant to our present problem—whether the nondisclosed income was from bootlegging, playing the races, bridge or poker games, or something else. The "occupation" of an applicant was

the question in the form Costello filed.* The form of the petition for naturalization did not ask for more; and unless we can say that "real estate" was not his "occupation" then we cannot let this denaturalization order stand. The Koslo Realty Corporation actually existed and petitioner was its president. It actually engaged in real estate transactions. The fact that this real estate business was secondary in petitioner's regime did not make it any the less his "occupation." Petitioner answered truthfully when he listed "real estate" as his "occupation." He did not answer truthfully if the answer is taken to embrace all his sources of income. But, as I said, the form did not require that complete disclosure; and I would not resolve any ambiguity in favor of the Government. We could not do so and be true to the strict standard exacted from the Government by *Schneiderman* v. *United States*, 320 U. S. 118, 122–123.

---

*The printed form of the Petition for Naturalization in use at the time had in it as item "Second" a line headed "My occupation is." After these words petitioner entered the words "Real Estate."