**In the Matter of the Petition of Romulo DE ROMA.**

**Civ. No. 84–4130.**

United States District Court, D. New Jersey.

Jan. 14, 1985.

---

Vincent Agresti, Newark, N.J., for plaintiff.

Edward Weiss, I.N.S. Newark, N.J., for defendant.

## OPINION

HAROLD A. ACKERMAN, District Judge.

Romulo de Roma became a citizen of the United States through naturalization on order of this Court on December 12, 1983. The District Director of Immigration and Naturalization at Newark, New Jersey, hereinafter referred to as I.N.S., now moves to have said order of this Court, insofar as it relates to Mr. de Roma, reopened and held in abeyance, to have the petition for naturalization of Mr. de Roma restored to a pending status, to have a further determination on the merits of petitioner's qualifications for naturalization made, and to have said order vacated in the event Mr. de Roma is found ineligible for naturalization.

This motion is brought pursuant to Section 340(j) of the Immigration and Nationality Act, 8 U.S.C. § 1451(j) and Rule 60(b) of the Federal Rules of Civil Procedure.

Mr. de Roma's naturalization was based on the Nationality Act of 1940, as amended on March 27, 1942, 56 Statutes 176 *et seq.* The application of this Act to Filipino World War II veterans has a complex history which provides the relevant background to the instant action. This history was very thoroughly described in the case of *In the Matter of Petitions for Naturalization of 68 Filipino War Veterans*, 406 F.Supp. 931 (N.D.Cal.1975) at pages 934–936 which I now quote:

"On March 27, 1942, Sections 701–705 were added to the Nationality Act of 1940 by the Second War Powers Act of 1942, ch. 199, 56 Stat. 176 et seq., as amended. Section 701 exempted alien servicemen who served outside the continental limits of the United States from certain of the usual requirements for naturalization, including those of a period of residence in the United States and literacy in English. As amended by sub-

sequent acts of Congress, it was ultimately specified that all petitions filed under Section 701 had to be filed no later than December 31, 1946. Section 702 provided for the naturalization overseas of persons eligible for naturalization under Section 701 who, while serving honorably in the military or naval forces of the United States, were not within the jurisdiction of any court authorized to naturalize aliens. Section 705 directed the Commissioner of Immigration and Naturalization, with the approval of the Attorney General, to make such rules and regulations as were necessary to carry into effect the provision of the act.

"Pursuant to the act, officers of the INS were sent to overseas military posts to effect the naturalization of eligible members of the United States armed forces. Between 1943 and 1946, these officers traveled from post to post through England, Iceland, North Africa, and the islands of the Pacific, naturalizing thousands of foreign nationals. In the Phillippines, of course, naturalization of alien servicemen was impossible during the Japanese occupation. However, with the liberation of the Philippines, implementation of the act commenced, following resolution of two preliminary problems of statutory interpretation concerning the eligibility of Filipino servicemen under Sections 701–702.

"In early August of 1945 the INS designated Mr. George H. Ennis, Vice Consul of the United States at Manila, to naturalize aliens pursuant to Section 702. "Pursuant to Section 10(a) of the Philippine Independence Act of 1934, ch. 84, 48 Stat. 463, the Philippines were to become a fully independent, self-governing country on July 4, 1946. Apparently fearful that large numbers of Filipinos would be naturalized and emigrate to the United States on the eve of independence, an unidentified official of the Philippine Government conveyed to the United States Department of state the Philippine Government's concern that Filipinos who had always been domiciled in the Philippines were being naturalized by Vice Consul Ennis. Based on this concern, on September 13, 1945, the Commissioner of the INS wrote to the Attorney General requesting that the authority previously granted to Vice Consul Ennis to naturalize aliens be revoked, and that no new naturalization officer be named. The Attorney General approved this request on September 26, 1945, and the authority of Vice Consul Ennis was immediately revoked. However, notice of that revocation did not reach Ennis until late October, 1945, for he continued to naturalize aliens until October 26, 1945. It was not until August, 1946, that another naturalization agent, Mr. P.J. Philips, was appointed for the Philippines. Approximately 4,000 Filipinos were naturalized by Mr. Philips under Section 702 between August and December 31, 1946, when the act expired. Thus, contrary to the express intentions of Congress, Filipinos eligible for naturalization under Section 702 were denied the opportunity to take advantage of the act for a period of approximately nine months."

Turning now to the matter before me, the United States Department of the Army certified to the INS on March 10, 1980, that Mr. de Roma served in the Philippine Commonwealth Army in an active duty status from August 22, 1944 to September 26, 1945. Mr. de Roma contends that his service ended March 18, 1946, but, for purposes of this motion, I do not need to decide that disputed fact.

By affidavit, Mr. de Roma asserts that on May 30, 1946, he proceeded to the office of Commissioner Paul McNutt in Manila to apply for citizenship, but he was advised that Commissioner McNutt had been withdrawn.

The INS alleges that these facts establish that Mr. de Roma was not in *active* service at the time he attempted to apply for citizenship, and thus, it was due to inadvertence and mistake that Mr. de Roma's naturalization petition was granted.

As the specific review of Mr. de Roma's original naturalization petition has not been described, I have no way of knowing how this mistake occurred or whether Mr. de Roma qualified on some other statutory basis.

A number of cases have been brought where Filipino World War II veterans have attempted to estop the government from opposing their naturalization petitions because of the cut-off date of December 31, 1946 provided for in Section 701 of the Nationality Act of 1940, since the government, by withdrawing its examiner from the Philippines had effectively denied Filipino Veterans the opportunity to apply before the cut-off date.

In *INS v. Hibi*, 414 U.S. 5, 94 S.Ct. 19, 38 L.Ed.2d 7 (1973) the Supreme Court refused to estop the government from relying on the December 31, 1946 expiration date and denied respondent Hibi's petition for naturalization.

Subsequently in *68 Filipino War Veterans, supra,* a Northern District of California court found a majority of the 68 Filipino veterans eligible for naturalization under Section 701 of the Nationality Act because, unlike Hibi, they had demonstrated that they had attempted to apply for naturalization during the statutory period but had been unable to do so due to the government's withdrawal or they convinced the Court that they would have applied had the officer not been withdrawn. These petitioners, the Court found, had been denied due process, an issue not raised or decided in Hibi. The government sought appeal of this case, but subsequently withdrew the appeal.

Most recently, in the Southern District of California, although the petitioner failed to prove that he made a reasonable inquiry or application for naturalization during the pertinent period, the Court found that the petitioner was still eligible for naturalization because the inquiry or application required of him would have been futile, since at that time, the INS was erroneously turning away applicants, who, like petitioner, were veterans of the Philippines Commonwealth Army. See *In Re Petition for Naturalization of Candelario Triol, slip opinion,* (filed July 27, 1984, S.D.Cal.).

These cases persuade me that, were Mr. deRoma before me on a petition for naturalization, I would have a duty to inquire into the details of his knowledge of the INS examiner's presence, or lack thereof, in the Philippines at the time of his active duty in the Army.

■ This matter comes before me, however, *not* in the guise of an alien seeking citizenship, but in the guise of the INS seeking to reopen and possibly revoke that citizenship. It is beyond peradventure that the "right to acquire American citizenship is a precious one, and that once citizenship has been acquired, its loss can have severe and unsettling consequences," and because of this, the government carries a heavy burden of proof in a proceeding to divest a naturalized citizen of his citizenship. *Fedorenko v. United States,* 449 U.S. 490, at 505, 101 S.Ct. 737, at 746, 66 L.Ed.2d 686 (1980) citing *Costello v. United States,* 365 U.S. 265, 81 S.Ct. 534, 5 L.Ed.2d 551 (1961); *Chaunt v. United States,* 364 U.S. 350, 81 S.Ct. 147, 5 L.Ed.2d 120 (1960); *Baumgartner v. United States,* 322 U.S. 665, 64 S.Ct. 1240, 88 L.Ed. 1525 (1944) and *Schneiderman v. United States,* 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796 (1943).

Because the INS is attacking this precious right with little explanation other than they made some mistake in processing Mr. de Roma's application, the exact nature of which is not entirely clear from their papers, I turn first to the procedural method the INS is using to attack the judgment of naturalization.

On its face, 8 U.S.C. Section 1451 provides two methods by which the government may attack a judgment of naturalization. Subsection (a) is the first and reads in pertinent part as follows: "(a) *Concealment of material evidence; refusal to testify.* It shall be the duty of the United States attorneys for the respective districts, upon affidavit showing good cause therefor, to institute proceedings in any

court specified in subsection (a) of section 1421 of this title [8 U.S.C.A. § 1421(a)] in the judicial district in which the naturalized citizen may reside at the time of bringing suit, for the purpose of revoking and setting aside the order admitting such person to citizenship and cancelling the certificate of naturalization on the ground that such order and certificate of naturalization were illegally procured or were procured by concealment of a material fact or by willful misrepresentation."

■ The affidavit showing good cause has been held to be an indispensible procedural prerequisite to suit under this section. See *United States v. Zucca,* 351 U.S. 91, 76 S.Ct. 671, 100 L.Ed. 964 (1956). No statute of limitations is involved and the time within which the action must be commenced is not circumscribed. The standard of proof required to denaturalize a naturalized citizen is strict, and the burden of proof is on the government to prove its case by clear, unequivocal and convincing evidence. *Costello v. United States,* 365 U.S. 265, 81 S.Ct. 534, 5 L.Ed.2d 551 (1961).

The second method, apparently authorized under subsection (j) of 8 U.S.C. § 1451, is the method by which the INS now brings this action. Subsection (j) reads: *"Power of court to correct, reopen, alter, modify or vacate judgment or decree.* Nothing contained in this section shall be regarded as limiting, denying or restricting the power of any naturalization court, by or in which a person has been naturalized, to correct, reopen, alter, modify, or vacate its judgment or decree naturalizing such person, during the term of such court or within the time prescribed by the rules of procedure or statutes governing the jurisdiction of the court to take such action."

This language ostensibly allows a summary procedure under Federal Rule of Civil Procedure 60(b) within one year of the entry of the original judgment. If the motion under Rule 60(b) were granted, the parties would be placed back in the position they were in prior to the granting of the order or naturalization; that is, the burden would

shift to Mr. de Roma to prove his qualifications for citizenship.

I note that Section (j) only ostensibly authorizes a denaturalization action under the instant circumstances because I do not accept the assumption made in some cases that 8 U.S.C. § 1451(j) was enacted in order to overrule the holding in *Bindzyck v. Finucane,* 342 U.S. 76, 72 S.Ct. 130, 96 L.Ed. 100 (1951). See, for example, *Simmons v. United States,* 452 F.2d 1110, 1114 (2d Cir.1971). *Bindzyck* held that Section 338 of the Nationality Act of 1940, the precursor to the present Section 1451(a), was the *exclusive* procedure to be used for revoking naturalizations on the ground of fraud or illegal procurement. My reading of the only subsequent Supreme Court decision touching on this issue, *United States v. Zucca,* 351 U.S. 91, 76 S.Ct. 671, 100 L.Ed. 964 (1956), leads me to believe that *Bindczyck* is still good law in many respects. See *Zucca,* Page 95 at footnote 8, 76 S.Ct. page 674 at footnote 8.

There is, however, no need to reach the issue of whether the INS *legally* may bring this action under the method they have chosen, for I find that even under the theory of law under which the INS proceeds, the motion to reopen the order of naturalization should be denied.

As noted in *In re Campbell's Petition,* 326 F.2d 101 (2d Cir.1964), section (j) is a grant of power to the Court to reopen its naturalization judgments, but it is stated in permissive terms.

■ It is well settled that motions for relief under Rule 60(b) are addressed to the discretion of the Court. See, for example, *Greco v. Reynolds,* 416 F.2d 965 (3d Cir. 1969); *England v. Doyle,* 281 F.2d 304 (9th Cir.1960).

In considering how I should exercise my discretion, I find that to allow the precious right of American citizenship to be revoked by such a summary procedure as is sought here would debase the value of the right of that citizenship and raise serious doubts in any citizen's mind that the law is in accord with the dictates of humanity and justice.

The exercise of my discretion in this way is in accord with the few other courts who have considered this issue. See *Petition of Zabala*, 573 F.Supp. 665 (E.D.N.Y.1983); *In re Campbell's Petition, supra., Petition of Arevalo*, 352 F.Supp. 215 (D.Hawaii 1972); but see *Petition of Cardines*, 366 F.Supp. 700 (D.Guam 1973).

Once citizenship has been granted, a naturalized citizen may not be deprived of his status without due process. This is *especially* true where the attack on the citizenship is due to the government's mistake, and not due to a misrepresentation or omission on the part of the petitioner.

I note that the vast majority of cases I have found concerning denaturalization arise out of an intentional omission or misrepresentation by the petitioner of a fact, which, if known by the INS, might have denied the petitioner citizenship. See, for example, *Arevalo, supra., Petition of Field*, 117 F.Supp. 154 (S.D.N.Y.1953); and *In re Bartkiu*, 199 F.Supp. 762 (E.D.Pa. 1961).

The history of the denaturalization provision found today in Section (a) demonstrates that Congress formulated a carefully safeguarded method for denaturalization because of their experience with the evils inherent in widely diverse naturalization procedures. Prior to the act of 1906 containing the first detailed denaturalization procedure, elections were influenced by irregular denaturalizations geared by government officials. See *Bindczyck* at 81–83, 72 S.Ct. at 133–134. Although no such evils are even intimated by this action today, there are still sufficient reasons for requiring the government to proceed under the safeguards established by Congress. The affidavit of good cause, for example, as noted in *United States v. Minerich*, 250 F.2d 721 (7th Cir.1958), allows the experienced judge to detect a reckless categorization or noncritical selection of candidates for denaturalization.

An affidavit of good cause, along with an adequate hearing would be an important step in making a fair determination on this matter. As the scanty record before me now stands, I have little more than the INS's unsworn statement that they made a mistake in analyzing Mr. de Roma's petition. This is not a sufficient basis on which to revoke a person's citizenship. The record is inadequate concerning details of what the statutory and factual basis of Mr. de Roma's naturalization was, how the alleged mistake was uncovered and why the INS has decided to expend their limited resources on this matter.

If the government wishes to proceed further to invalidate Mr. de Roma's judgment of naturalization, it must resort to a plenary action under 8 U.S.C. § 1451(a).