**Commonwealth v. Monk**

*Christy H. Fawcett, assistant district attorney,* for the Commonwealth.
*Eugene R. Campbell,* for defendant.

UHLER, *J.,* February 24, 1992—Before the court is defendant, Phillip D. Monk's motion to suppress all statements made by the defendant, and to suppress all physical evidence against the defendant seized pursuant to the execution of a search warrant.

Defendant contends that the affidavit of probable cause is deficient in that it fails to contain facts which would enable the issuing authority to make an independent determination that seizable evidence would be found on the premises to be searched. He contends through counsel that probable cause was lacking wherein the matters brought to the district justice's attention were largely "boiler plate," failed to provide any reliability or indicators of reliability regarding the identification of marijuana by the informant, failed to identify when the alleged marijuana was observed by the informant, failed to describe the environs from which affiant contends he secured the garbage bag attributed to the defendant, and fails to link the garbage bag to the defendant. Defendant also contends affiant has no right to trespass on his property and "root" through his trash. For the reasons outlined below, we agree and grant defendant's motion to suppress.

The first issue before the court is whether or not probable cause can be found within the "four corners"

of the affidavit, so as to satisfy United States and Pennsylvania constitutional requirements and Rule 2003 of the Pennsylvania rules of Criminal Procedure. The second issue before the court is whether or not defendant had a reasonable expectation of privacy in garbage found in front of his residence, and if not, was the garbage identified specifically enough to link it with defendant. We set forth in full the affidavit and incorporate the same of record:

The affiant, Michael T. Burke, being duly sworn, deposes and states as follows:

"(1) The affiant has been employed as a narcotics agent with the Office of the Attorney General—Bureau of Narcotics investigation for approximately one year. Prior to this position, the affiant was employed as a police officer with the Harrisburg Police Department for approximately three years. During the past four years, the affiant has been involved in no fewer than 50 investigations involving violations of both state and federal narcotic laws. The affiant has been involved in the arrests of over 100 persons for various narcotic laws violations. The affiant has also been involved in Special Operations Teams (SWAT), in both the Harrisburg Police Bureau and the Attorney General's Office, wherein he has been involved in numerous search warrants for illegal substances. The affiant has been involved in over 50 search warrants, including search warrants on indoor marijuana growing operations. These warrants have resulted in the seizure of quantities of controlled substances, cutting materials, packaging implements and other related drug paraphernalia; as well as U.S. currency, vehicles and records pertaining to the violations of the state and federal narcotics laws.

"(2) The affiant, during the course of his law enforcement career has had extensive experience in debriefing defendants, participating witnesses, informants and other persons who have had personal knowledge and experience in the illicit business of indoor and outdoor marijuana growing. In addition, the affiant has been personally involved in investigations surrounding persons and/or organizations responsible for manufacturing and distributing marijuana. Based upon the affiant's training and experience in these types of investigations, the affiant knows:

"(a) That it is common for indoor marijuana growers, when purchasing the equipment to grow marijuana indoors (lights, fertilizers, rockwool, ebb and flow systems, $CO_2$, fans and wall coverings), that they will tell the sellers of this equipment that they are 'legitimate growers' (growing vegetables, flowers and herbs). But unlike legitimate growers, the marijuana growers will not talk specifically about their crops and generally will not seem to know even the simple facts about flowers, vegetables and herbs.

"(b) That marijuana growers often order the items mentioned in paragraph (a) in fictitious names or have other people pick the equipment up for them.

"(c) That indoor marijuana growers will always pay cash as opposed to checks and credit cards for their equipment, to avoid any inquiries as to their identity or purpose.

"(d) That marijuana growers go to extremes to conceal their marijuana growing operation. Furthermore, that marijuana growers do not allow people (i.e., postal

carriers, electric and gas personnel and neighbors) on their property, or near their grow rooms.

"(e) That it is common for marijuana growers to conceal in their residences, or grow rooms; caches of drugs, large amounts of currency, paraphernalia for packaging, cutting, weighing and distributing marijuana. Marijuana growers will also conceal in their residences and grow rooms; books, ledgers, records and receipts related to the manufacturing and distribution of marijuana.

"(f) That marijuana growers frequently maintain firearms or weapons to protect both the marijuana and the proceeds from the marijuana. Furthermore, marijuana growers also utilize attack dogs as well as booby traps to discourage individuals such as police officers from discovering their marijuana crops.

"(g) That indoor growing operations are often characterized by: a building structure that is not visible by way of public roads; a building structure that has lights on inside during the late hours or early hours of the day; and a building structure that appears to be closed up in certain parts.

"(h) That it is common for indoor and outdoor marijuana growers to clean, trim, manicure, harvest, dry, cure, etc. the marijuana indoors, out of public view.

"(i) That it is common for marijuana growers to throw away the cuttings of the harvested marijuana in their trash.

"(3) On September 25, 1991, NAs Burke and Lowe received information from a concerned citizen (confidentiality requested) regarding an individual identified as Phillip Monk. This confidential informant, here-

tofore identified as CI 363-91, advised NAs Burke and Lowe that he/she knew that Monk, along with another individual, Bruce Ruppert, who lives with Monk and carries the same address as Monk on his Pennsylvania drivers license, is involved in an illicit marijuana growing operation, on Monk's property, rented or owned, in York, Pennsylvania. CI 363-91 also stated that Monk has marijuana growing outside of his residence and believes that Monk has a room in his home devoted to the growing and cultivation of marijuana. CI 363-91 told the NAs that he/she has seen marijuana inside the residence on a number of occasions.

"(4) On September 27, 1991, NA Burke, using the Mapper, CLEAN and PennDOT computers, learned that there existed a Phillip Monk at R.D. 9, Box 105, York, Pennsylvania. NA Burke found that this Monk possessed an extensive criminal history record with at least two violations of the Controlled Substance, Drug, Device and Cosmetic Act of Pennsylvania.

"(5) On October 1, 1991, NA Lowe met with CI 363-91 at a secluded location and drove with he/she past the residence of Phillip Monk.

"(6) On this date NA Lowe was able to view the residence of Monk from the vehicle, (residence to be described in the 'property attachment' section of the affidavit). While passing the house CI 363-91 pointed out to NA Lowe that Monk was in the yard.

"(7) On October 7, 1991, NAs Burke and Lowe drove past the residence of Phillip Monk that CI 363-91 pointed at. At this time the NAs were able to determine there were many persons working on an addition in

the rear of the residence. Some of these individuals were drinking cans of Old Milwaukee beer.

"(8) On October 8, NAs Burke and Lowe pulled the trash in front of Monk's residence and found suspected marijuana stems and leaves. These were brought back to Region III headquarters and tested by NA Lowe and witnessed by NA Burke at 0845 hours. This residue tested positive for marijuana at this time. Also found in this trash were many cans of Old Milwaukee beer."

From the affidavit, the facts of this case are clear. On September 25, 1991, affiant Michael T. Burke and Narcotics Agent Thomas Lowe, received information from a confidential source regarding defendant's alleged drug activity. The confidential source named defendant and his housemate, Bruce Ruppert, as persons being involved in an illicit marijuana growing operation "on [defendant's] property ... in York, Pennsylvania." The confidential source also stated, "that [defendant had] marijuana growing outside of his residence" The confidential source also "[believed] that [defendant had] a room in his house devoted to the growing and cultivation of marijuana." The confidential source claims that he/she had seen "marijuana inside the residence on a number of occasions."

On September 27, 1991, affiant Burke, using the Mapper, CLEAN and PennDOT computers, located a "Phillip Monk" living at R.D. 9, Box 105, York, Pennsylvania. Through his research, Burke tracked defendant's "extensive criminal history record" which included two previous violations of the Controlled Substance, Drug, Device and Cosmetic Act of Pennsylvania.

On October 1, 1991, Lowe again met with the confidential source to drive past the residence of defendant. On October 7, 1991, Burke and Lowe drove past the residence identified by the confidential source as belonging to the defendant. On said date, the affidavit reflects that "many persons [were] working on an addition in the rear of the residence." Burke and Lowe claim they noticed "[s]ome of these individuals were drinking cans of Old Milwaukee beer."

On October 8, 1991, Burke and Lowe "pulled the trash in front of [defendant's] residence and found suspected marijuana stems and leaves." Also found in this trash "were many cans of Old Milwaukee beer."

On October 9, 1991, a search warrant was secured, and at 7 a.m., the police conducted a search of defendant's residence and found drugs and drug paraphernalia. Subsequent to the search, defendant was immediately arrested and charged with the possession of drugs, namely marijuana, with the intent to manufacture and deliver a controlled substance. Thereafter, defendant made several post-Miranda statements. Defendant was arraigned on November 29, 1991. On January 22, 1992, this court was presented with defendant's motion to suppress, which, for the following reasons, we grant.

Specifically, we find that the herein mentioned search warrant is constitutionally defective viewed as a whole in that it fails to establish probable cause that marijuana would be at the location to be searched on the date it was issued. Further, we find that the warrant fails to set forth with specificity the date upon which the anonymous informant observed the marijuana. Finally,

we hold that the affidavit fails to specifically establish that the garbage bag searched was that of defendant's.

In *Commonwealth v. Conner,* 452 Pa. 333, 305 A.2d 341 (1973), the Supreme Court of Pennsylvania found that a search warrant is defective if it is issued without reference to the time when the informant obtained his or her information. *Conner,* 452 Pa. at 339, 305 A.2d at 345; *Commonwealth v. Edmunds,* 373 Pa. 384, 586 A.2d 887 (1991).

In the instant case, the affidavit makes no mention of the date the confidential source obtained his or her information as to the defendant's drug activity within defendant's residence. Specifically, with reference to the affidavit, it is noted that the confidential source "told the [narcotic agents] that he/she [had] seen marijuana inside the residence on a number of occasions." Such a lack of specificity ordinarily would render the search warrant defective. Therefore, reading *Edmunds* and *Conner* in conjunction with Pa.R.Crim.P. 2003, which mandated that Pennsylvania courts shall not consider oral testimony outside the four corners of the written affidavit to supplement the finding of probable cause for a search warrant, we must follow precedent and conclude that the "affidavit of probable cause and warrant were facially invalid." *Edmunds,* 373 Pa. Super. at 388, 586 A.2d at 891. The officer's subsequent observations and findings fail to corroborate the loosely framed description given by the informant.

With respect to the search of defendant's garbage, the general rule is that "placing trash for collection is an act of abandonment" which terminates any reasonable expectation of privacy. *Commonwealth v. Per-*

*due,* 387 Pa. Super. 473, 564 A.2d 489 (1989); *Commonwealth v. Minton,* 288 Pa. Super. 381, 391, 432 A.2d 212, 217 (1981). Accordingly, we must hold that defendant had no Fourth Amendment protection with respect to his own garbage. However, we find it necessary to exclude the allegation concerning defendant's garbage from our consideration of the affidavit as we find that it lacks probative value as described therein.

On October 8, 1991, Burke and Lowe examined garbage, which was reportedly found in front of defendant's residence. In said garbage, the agents found suspected marijuana stems and leaves. The agents then took the suspected marijuana residue back to headquarters where they tested it and noted that the residue tested positive for marijuana. In the affidavit, Burke and Lowe noted that they also found cans of Old Milwaukee beer in defendant's alleged garbage. The pertinent part of Burke's affidavit reads as follows:

"(7) On October 7, 1991, NAs Burke and Lowe drove past the residence of Phillip Monk that CI 363-91 pointed out. At this time the NAs were able to determine there were many persons working on an addition in the rear of the residence. Some of these individuals were drinking cans of Old Milwaukee beer.

"(8) On October 8, 1991, NAs Burke and Lowe pulled the trash in front of Monk's residence and found suspected marijuana stems and leaves. These were brought back to Region III headquarters and tested by NA Lowe and witnessed by NA Burke at 0845 hours. This residue tested positive for marijuana at this time. Also found in this trash were many cans of Old Milwaukee beer."

Prosecution would have us believe that a search warrant "doesn't get any better than this." We do not agree. The affidavit in question does not describe the neighborhood or what is meant by "pulled the trash in front of Monk's residence," nor does it specify whether said trash was found in a can, a bag, or whether it was simply laying loose in the street. The affidavit completely fails to describe the neighborhood or situs where this residence may be found, or the number of trash containers situate in "front" of the residence. Moreover, the affidavit does not establish whether any personal effects of the defendant's, such as letters addressed to or written by him, were found in the trash.

Therefore, absent further information within the "four corners" of the affidavit, we conclude that Old Milwaukee beer is not a unique beverage as to establish a sufficient linkage for a neutral magistrate to conclude that said garbage "emanated from the premises sought to be searched." See *Commonwealth v. Minton,* 288 Pa. Super. 381, 386, 432 A.2d 212, 217 (1981); *Commonwealth v. Perdue, supra.* The balance of the affidavit is clearly of a boiler plate nature and found in a similar warrant application contemporaneously filed by the co-affiants.

Defendant further requests that all statements made should be suppressed. We agree. "The 'fruit of the poisonous tree' doctrine excludes evidence obtained from or as a consequence of lawless official acts, not evidence obtained from an 'independent source.'" *Commonwealth v. Arlondo,* 397 Pa. Super. 364, 580 A.2d 341 (1990); *Commonwealth v. Gibbs,* 387 Pa. Super. 181, 185, 536 A.2d 1244, 1246 (1989); *Costello v. United States,* 365 U.S. 265, 280, 81 S.Ct. 534, 542, 5 L.Ed.2d 551, 561 (1961). As defendant's statements in the instant case were obtained as a result of an illegal

search, we deem it appropriate that such statements must be suppressed.

An appropriate order will be entered.

## ORDER

And now, February 24, 1992, defendant Phillip Monk's motion to suppress all physical evidence and statements is hereby granted.