STATE ex rel. J.E. DUNN CON-
STRUCTION COMPANY,
Respondent/Relator,

and

The City of Kansas City, Missouri,
Respondent/Intervenor,

v.

FAIRNESS IN CONSTRUCTION BOARD
OF THE CITY OF KANSAS CITY,
MISSOURI, Appellant/Defendant,

and

DiCarlo Construction Company,
Appellant/Intervenor.

Nos. WD 53272, WD 53277.

Missouri Court of Appeals,
Western District.

Dec. 30, 1997.

As Modified Jan. 27, 1998.

Taylor Fields, Stephen Miller, Kansas City, for Appellant.

Roy Bash, Kansas City, Dorothy Lee Campbell, Government Counsel, Kansas City, for Respondent.

HANNA, Judge.

This appeal is from the circuit court's order making absolute a preliminary writ of prohibition which ceased the continuation of a hearing before an administrative board. The writ of prohibition was issued by the Honorable K. Preston Dean at the Jackson County Circuit Court. The appellants are the administrative board, Fairness in Construction Board of the City of Kansas City, Missouri (Fairness Board) and the unsuccessful (next lowest) bidder on the project, DiCarlo Construction Company (DiCarlo). The respondents are the bidder who was awarded the contract, J.E. Dunn Construction Company (Dunn), and The City of Kansas City, Missouri (City). The Fairness Board was in the process of hearing an appeal from a City Human Relations Department determination that Dunn, who was subsequently awarded a City construction contract, had made good faith efforts to achieve the minority and women sub-contracting goals set on the project. The City construction contract was for the Terminal C parking garage project at Kansas City International Airport (K.C.I.).

The appellants claim that the circuit court erred in issuing the writ of prohibition because: (1) the circuit court's basis for issuing the writ (*res judicata*) was improper; (2) the writ cannot be sustained on the ground that the Fairness Board lacked subject matter jurisdiction; (3) the circuit court issuing the writ did not have subject matter jurisdiction because Dunn failed to exhaust its administrative remedies; (4) the respondents waived their right to seek a writ of prohibition by appearing and participating in the Fairness Board hearings; and (5) the writ was an improper remedy.[1]

The Fairness Board was created in December of 1991, via a voluntary Letter Agreement between the Mayor of Kansas City and various minority groups and contractor associations, in order to "maximize participation of all components of the construction industry of Kansas City in construction contracts awarded by [the] City." The Mayor's Letter Agreement charged the Fairness Board "with the responsibility of overseeing all construction bids, and to determine if good faith efforts have been met on any given bid" with regard to minority/women subcontracting participation.

On March 7, 1996, the City Council passed § 38–84 through § 38–100 of the Code of Ordinances of Kansas City (the "Disparity Ordinance") which created a minority and women enterprise program. The Disparity Ordinance evidently re-authorized the Fairness Board to "ensure fair representation in the bidding process by socially and economically disadvantaged persons including minorities and women." Section 38–100. The Disparity Ordinance gives the Fairness Board the responsibility to "hear and decide appeals from the [H]uman [R]elations [D]epartment's determinations." Section 38–100(f).

The underlying facts are as follows. In November of 1995, the Aviation Department issued bid specifications for the Terminal C parking garage project at K.C.I. On January 9, 1996, the bids were opened by the City. Dunn was the low bidder, and DiCarlo was the second lowest bidder. The Human Relations Department of the City implements the Minority Business Enterprise (MBE) and Women Business Enterprise (WBE) program which sets goals for minority and women-owned businesses as subcontractors on city construction contracts of $20,000 or more. The Human Relations Department and the Aviation Department apparently worked with Dunn regarding the bid process and its MBE/WBE participation on the project.[2] The Human Relations Department eventually approved Dunn's MBE/WBE plan on February 29, 1996.

---

1. Note that we have combined the appellants points on appeal, and have addressed them out of the order in which they were pled.

2. The MBE and WBE participation goals for the project were 15 percent and 7 percent respectively. Dunn's final affidavit of intended utilization indicated a 15.78 percent MBE participation and a .88 percent WBE participation.

The Aviation Department then initiated the ordinance process before the City Council for the Terminal C contract. The ordinance awarding the contract to Dunn was introduced, and then referred to the City Council's Audit and Operations Committee. The Director of the Human Relations Department prepared a memo, dated March 19, 1996, regarding Dunn's good faith efforts in connection with the pending ordinance, for the Operations Committee's review. A Docket Memo was also prepared for the Operations Committee that listed Dunn's MBE/WBE participation as verified by the Human Relations Department. The Human Relations Department recommended that the City Council approve a good faith exemption and award the contract on the Terminal C project to Dunn. The City Council unanimously approved the ordinance on March 27, 1996, and awarded the contract to Dunn. The ordinance took effect 10 days after the City Council's approval on March 31, 1996. Dunn was authorized to proceed with the project, and has done so.

Meanwhile, DiCarlo was taking actions to protest the award of the project to Dunn. DiCarlo contested the procedure by which the Human Relations Department worked with Dunn in order for Dunn to gain approval of its MBE/WBE plan. On March 13, 1996, DiCarlo filed an action in the United States District Court for the Western District of Missouri against the Aviation and Human Relations departments of the City. Dunn intervened in that action. The Honorable Scott Wright held hearings on May 16 and 17, 1996. On May 17th, Judge Wright concluded the hearings by indicating that he would be ruling in favor of the City and would dismiss the action. Later that afternoon, DiCarlo filed its Notice of Appeal with the Fairness Board from the: (1) determination and resulting recommendation of the Human Relations Department that Dunn be awarded the contract, and (2) action of the

Operations Committee in recommending that the City Council award the project to Dunn. Subsequently, on May 22, 1996, Judge Wright issued his written opinion dismissing the DiCarlo federal action and enter an order granting summary judgment in favor of Dunn and the City.

The Fairness Board then held four hearings regarding the DiCarlo appeal. Counsel for Dunn had previously written the Chairman of the Fairness Board requesting permission to intervene, and it was allowed to participate in the hearings. On July 3, 1996, while the proceeding was pending, Dunn filed a verified petition for writ of prohibition with the circuit court asking for a writ prohibiting the Fairness Board from hearing DiCarlo's appeal. DiCarlo and the City filed motions to intervene, which were granted by the circuit court. After a hearing on the matter, the circuit court made its preliminary writ absolute in an order dated August 1, 1997. The basis for the writ was that the federal court dismissal order precluded DiCarlo from proceeding with its claim before the Fairness Board under the doctrine of *res judicata*. This appeal followed.

In the federal action, DiCarlo alleged subject matter jurisdiction under 28 U.S.C. § 1331(federal question jurisdiction) and 28 U.S.C. § 1343(a)(3)(civil rights and elective franchise). DiCarlo claimed that the actions of the City during the bid procedures violated the Due Process Clause in that it denied them a federally protected property right, which would allow a federal remedy pursuant to 42 U.S.C. § 1983. The federal court ruled that DiCarlo could not establish that it had a constitutionally protected property interest (as the second lowest bidder) because it could not demonstrate that the apparent low bidder violated the bidding procedure.[3] Since DiCarlo could not establish a property interest, the federal court held that it did not have subject matter jurisdiction.

---

**3.** The federal court found that it need not determine if Missouri would recognize a property interest for the second lowest bidder (when the bidding procedure was violated) because DiCarlo could not:

establish that they have a constitutionally protected property interest. After reviewing the exhibits submitted by plaintiffs and the testi-

mony gathered during a day and a half hearing, it is clear that they cannot establish that they offered the "lowest and best bid." More specifically stated, they cannot demonstrate that Dunn, the apparent lowest bidder, violated the City's Prequalification Ordinance or the bidding procedure.

DiCarlo also claimed an Equal Protection Clause violation by asserting that the City did not comply with its own ordinances and, as such, accorded Dunn's bid preferential treatment. The federal court, however, found that DiCarlo could not demonstrate that it was treated differently than Dunn. As such, no violation of the Equal Protection Clause occurred. The result, therefore, was that the federal court found that DiCarlo did not present any constitutional claims.

DiCarlo asked for the following relief from the federal court: (1) a temporary restraining order, injunctive relief and a permanent order enjoining the City from entering into a contract with Dunn, and (2) a declarative order commanding the City to reject Dunn's bid and consider DiCarlo's bid. Instead the federal court granted the City's and Dunn's motions and ordered the case dismissed.[4] After its case was dismissed in federal court, DiCarlo proceeded to the Fairness Board.

In its notice of appeal to the Fairness Board, DiCarlo asked for review of the Human Resource Department's determination and recommendation that the project be awarded to Dunn, and also of the Operations Committee's identical recommendation to the City Council. In subsequent documents, DiCarlo also requested a Fairness Board ruling that the bidding process was flawed and unfair to DiCarlo and the other bidders, and that Dunn should be made to stand by its initial MBE/WBE submission. In its Position Paper submitted to the Fairness Board, DiCarlo claimed that the City's conduct during the bidding process "violated the terms of the Bid Solicitation and City Ordinances; provided an unfair advantage to Dunn; undermined the competitive bidding process; frustrated the purpose of the MBE/WBE program; and destroyed public confidence in City government."

In ordering the writ absolute, the circuit court found that the federal court had heard evidence on the matter and ruled that DiCarlo could not, as a matter of law, prove that the contract was improperly ordered. The circuit court indicated that DiCarlo could not

now re-litigate the issue in another forum and, therefore, the proceeding before the Fairness Board was barred by *res judicata.* As such, the circuit court entered a writ of prohibition that terminated the proceedings in front of the Fairness Board.

■ The power to issue a writ of prohibition is limited to correction or limitation of an inferior court or agency that is acting without, or in excess of, their jurisdiction. *See Scott County Reorganized R–6 School Dist. v. Missouri Comm'n on Human Rights,* 872 S.W.2d 892, 894 (Mo.App.1994)(citing *State ex rel. Noranda Aluminum, Inc. v. Rains,* 706 S.W.2d 861, 862 (Mo. banc 1986)). *See also State ex rel. Norwood v. Drumm,* 691 S.W.2d 238, 241 (Mo. banc 1985). A writ of prohibition does not issue as a matter of right, and whether a writ should be issued in a particular case is a question left to the sound discretion of the court to which the application has been made. *See Derfelt v. Yocom,* 692 S.W.2d 300, 301 (Mo. banc 1985); *State ex rel. Hartman v. Casteel,* 678 S.W.2d 816, 818 (Mo.App.1984).

■ The discretionary authority of the court to issue a writ of prohibition, however, is exercised when the facts and circumstances of a particular case demonstrate unequivocally that there exists an extreme necessity for preventative action. *See Derfelt,* 692 S.W.2d at 301. A writ of prohibition is an extraordinary remedy and it should be used with "great caution, forbearance, and only in cases of extreme necessity." *Missouri Dept. of Soc. Serv. v. Admin. Hearing Comm'n,* 826 S.W.2d 871, 873 (Mo.App.1992). Accordingly, the trial court must find that a showing was made that the administrative body exceeded its jurisdiction, and that the remedy of appeal is not available to the relator. *Id.* at 872.

Collectively, the appellants assert that the circuit court erred in issuing a writ of prohibition because the federal court order does not bar the Fairness Board's proceedings and *res judicata* does not apply. The circuit court found that the federal decision, which

---

4. The federal court noted that "[e]xhibits were provided and testimony was taken regarding the issues presented in the motions. As a result, this Court will treat defendants' submissions as Motions For Summary Judgment. Fed.R.Civ.P. 12(b)."

granted the City and Dunn's motions for summary judgment, was a decision on the merits. Furthermore, the circuit court found that the parties currently before the Fairness Board were the same parties involved in the federal action, and that the issue was also the same in both actions.[5]

The doctrine of *res judicata* prohibits the same parties, or their privies, from relitigating the same cause of action. *See American Polled Hereford Ass'n v. City of Kansas City*, 626 S.W.2d 237, 241 (Mo. banc 1982). A final judgment, rendered on the merits, by a court of competent jurisdiction is conclusive as to the parties and their privies in all other actions in the same or any other judicial tribunal of concurrent jurisdiction. *See Jordan v. Kansas City*, 929 S.W.2d 882, 885 (Mo.App.1996). An attempt to exercise jurisdiction in a matter barred by *res judicata* may be restrained by writ of prohibition. *See State ex rel. Hamilton v. Dalton*, 652 S.W.2d 237, 239 (Mo.App.1983). The appellants claim that *res judicata* does not apply because: (1) the federal action was not a decision on the merits, and (2) the claim dismissed by the federal court was neither the same cause of action, nor the same issues as those presented to the Fairness Board.

The threshold question—whether the federal order was a decision on the merits—is contested by the parties. Federal law determines the effects under the rules of *res judicata* of a judgment of a federal court. *Andes v. Paden, Welch, Martin, & Albano*, 897 S.W.2d 19, 21 (Mo.App.1995)(citing *Restatement (Second) of Judgments* § 87 (1982)). The preclusive effect of a federal involuntary dismissal is governed by Rule 41(b) of the Federal Rules of Civil Procedure. The rule states that unless a court specifies otherwise, orders for dismissal operate as an adjudication on the merits, unless the dismissal is for "lack of jurisdiction." *See* Rule 41(b) Fed. R. Civ. Pro.

The respondents claim that the federal court's order is either a summary judgment or a dismissal for failure to state a claim

(with a refusal to exercise jurisdiction over any state law claims) and, therefore, is a decision on the merits. In order to determine whether it had jurisdiction pursuant to 42 U.S.C. § 1983, they maintain that the federal court first had to determine whether DiCarlo had a property right which required constitutional protection. The federal court found that DiCarlo "cannot demonstrate that Dunn, the apparent low bidder, violated the City's Prequalification Ordinance or the bidding procedure" and that they "cannot demonstrate that they were treated differently than Dunn."

Respondents assert, therefore, that the federal court decided the merits of the claims when it made the ultimate decision that it lacked jurisdiction. Although nominally dismissing for lack of subject matter jurisdiction, the respondents claim that only cases that are dismissed for lack of jurisdiction without looking at the merits of the case fall within the rubric of Rule 41(b) Fed. R. Civ. Pro. dismissals for lack of jurisdiction. *See Costello v. U.S.*, 365 U.S. 265, 285, 81 S.Ct. 534, 544–45, 5 L.Ed.2d 551 (U.S.N.Y.1961). "If the defendant is put to the inconvenience of preparing a defense and there is no initial bar to the court looking at the merits, any dismissal constitutes a judgment on the merits." *Id. See also Bell v. Hood*, 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939 (U.S.Cal.1946)(finding that "[I]t is well settled that the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction.")

In contrast, the appellants maintain that the federal court ruled that it lacked subject matter jurisdiction. They maintain that, under federal and Missouri law, a dismissal for lack of subject matter jurisdiction is not a decision on the merits and has no preclusive effect. *See Baldwin v. Iowa State Traveling Men's Ass'n*, 283 U.S. 522, 51 S.Ct. 517, 75 L.Ed. 1244 (U.S.Iowa 1931); *Collins & Assoc. Dietary Consultants, Inc. v. Labor & Indust. Relations Comm'n*, 724 S.W.2d 243, 245 (Mo. banc 1987). The appellants claim that the federal court never intended its or-

---

**5.** The circuit court characterized the issue as: "was the contract improperly awarded to Dunn

due to inadequate MBE/WBE participation, etc."

der to be construed on the merits because of its finding that "because plaintiff cannot establish a property interest, this court does not have subject matter jurisdiction and the defendant's motion must be granted on this issue."[6] They assert that summary judgment is an improper mode for disposing of a case when the court lacks subject matter jurisdiction. *See Winslow v. Walters,* 815 F.2d 1114, 1116 (7th Cir.1987); *Parmer v. Bean,* 636 S.W.2d 691, 695 (Mo.App.1982).

■■■ Under Missouri law, where there is a question whether the previous decision went to the merits of the case, no preclusive effect is given to the earlier decision. *See S.M.B. by W.K.B. v. A.T.W.,* 810 S.W.2d 601, 605 (Mo.App.1991)(citing *Owens v. Government Employees Ins. Co.,* 643 S.W.2d 308, 310 (Mo.App.1982)).[7]

The federal order is apparently divided into two separate determinations. In the order, the court initially indicates that it found "that plaintiffs have not presented constitutional claims." Under the heading "Property Interest," the court found that it lacked subject matter jurisdiction for the claims alleged under 42 U.S.C. § 1983, because DiCarlo had no constitutionally protected property interest.[8] It appears that the federal court is clearly dismissing the *due process claim* for want of subject matter jurisdiction. However, the court goes on to rule that "[m]ore specifically stated, [DiCarlo] cannot demonstrate that Dunn, the apparent lower bidder, violated the City's

Prequalification Ordinance or the bidding procedure."[9]

■■■ Under the heading "Equal Protection," the federal court found that DiCarlo could not, as a matter of law, establish a constitutional *equal protection claim* in that DiCarlo could not demonstrate it was treated differently than Dunn in the City's contracting process. We presume that this was a dismissal for failure to state a claim.[10] The court granted all of the defendants' motions, which the court had previously indicated it would be treating as motions for summary judgment, and ordered the case "dismissed."

■■■ With regard to *res judicata,* if uncertainty exists as to "whether the previous decision went to the merits of the case, no preclusive effect is given the earlier decision." *S.M.B. By W.K.B.,* 810 S.W.2d at 605 (citations omitted). As such, we are unable to hold that the federal court decision was clearly on the merits. Where there is a question, no preclusive effect is given to the earlier decision. *See Mt. Hawley Ins. Co. v. Azia Contractors, Inc.,* 886 S.W.2d 640, 643–44 (Mo.App.1994). *See also Hangley v. American Family Mut. Ins. Co.,* 872 S.W.2d 544, 548 (Mo.App.1994)(finding that a ruling on summary judgment was not on the merits).

■■■ The more compelling reason why *res judicata* is not applicable here, is because the issues presented and the relief sought before

6. DiCarlo claims this is also evidenced by Judge Wright's comments during the proceedings in federal court. Although we have been provided a transcript of the federal action, we are confining our review to the order issued by the federal court.

7. Note that collateral estoppel also does not apply to a general judgment "which does not clearly reflect exactly what issues were decided." *Green v. Montgomery Ward & Co., Inc.,* 775 S.W.2d 162, 164 (Mo.App.1989) (ruling that a prior judgment dismissing for lack of jurisdiction and lack of venue did not collaterally estop a subsequent court from asserting jurisdiction). *See also Burton v. State,* 726 S.W.2d 497, 499 (Mo.App.1987).

8. The order specifically states that "[b]ecause plaintiff cannot establish a property interest, this court does not have subject matter jurisdiction

and defendants' motions must be granted on this issue."

9. The federal court made additional specific findings, in order to support its decision, such as: "[t]he City had every right to waive ..." requirements in the bidding documents regarding timely submissions and "the affidavit was properly attached to [Dunn's] bid and in no way violated the ordinance."

10. DiCarlo also argues that the federal court did not intend for its order to be construed as having the *res judicata* effect of a summary judgment because the court failed to properly convert the City's and Dunn's motions to dismiss for lack of subject matter jurisdiction into motions to dismiss for failure to state a claim. *See Layton v. United States,* 919 F.2d 1333, 1334 (8th Cir. 1990). We have not addressed nor ruled on this argument.

the federal court were not the same as those before the Fairness Board. In addition to the threshold requirement that the prior judgment be on the merits, Missouri also has a four-part test to determine whether *res judicata* applies. *See Andes,* 897 S.W.2d at 23. In order to sustain a bar of *res judicata,* the party asserting it must show that four identities of both actions has occurred: (1) identity of the thing being sued for; (2) identity of the cause of action; (3) identity of the persons and parties to the action; and (4) identity of the quality of the person for or against whom the claim is made. *See King General Contractors, Inc. v. Reorganized Church of Jesus Christ of Latter Day Saints,* 821 S.W.2d 495, 501 (Mo. banc 1991); *Prentzler v. Schneider,* 411 S.W.2d 135, 138 (Mo. banc 1966)(citing *Norwood v. Norwood,* 353 Mo. 548, 183 S.W.2d 118 (1944)).

As an initial matter, the identity of the persons and parties of both actions are, at this point in the litigation, the same.[11] Dunn and DiCarlo have created an adversarial relationship in front of the Fairness Board, which does not legally exist. We are not aware of an appropriate legal reason why Dunn was allowed to intervene as a party in the Fairness Board hearing. Certainly, the Fairness Board's investigation might have, at some point, desired testimony (and/or documentation) from Dunn, but it is not necessary for them to be a party to the proceeding. Even so, the intervention should not convert the Fairness Board proceeding into a contest between DiCarlo and Dunn. The purpose of the Fairness Board is not to settle disagreements between two bidders, and that cannot be changed or altered because of DiCarlo's points on appeal or because Dunn was allowed to intervene in the hearing.[12] The appellants contend, however, that the respondents have failed to establish that the

identity of the thing sued for, as well as the identity of the cause of action brought by DiCarlo before the federal court and the Fairness Board, are the same.

The "identity of the cause of action" is defined as "the underlying facts combined with the law, giving a party a right to a remedy of one form or another based thereon." *State ex rel. Shea v. Bossola,* 827 S.W.2d 722, 723 (Mo.App.1992). *See also Barkley v. Carter County State Bank,* 791 S.W.2d 906, 910 (Mo.App.1990)(citing *Grue v. Hensley,* 357 Mo. 592, 210 S.W.2d 7, 10 (1948)). Actions arising from the same facts and circumstances constituting the foundation of the claims are deemed the same cause of action. *See Jordan,* 929 S.W.2d at 886.

The appellants assert that the constitutional claims before the federal court were not the same cause of action as the matter in front of the Fairness Board. The federal action was for rights violations based on the UNITED STATES CONSTITUTION and 42 U.S.C § 1983. The action in front of the Fairness Board, on the other hand, is an appeal of the bidding process based on a right to appeal a city decision in the bid solicitation, a Letter Agreement ratified by the City Council, and the Disparity Ordinance. The appellants claim that the issues before the Fairness Board involve the decision made by the Human Relations Department, regarding Dunn's good faith effort to meet MBE/WBE project goals. The appellants maintain that these were not issues before the federal court.

The respondents argue that both the claims brought by the appellants concern the same transaction—the treatment of Dunn's bid and the eventual awarding of the Terminal C project to Dunn. The respondents cite *Shea v. Bossola,* as factually similar. 827

---

**11.** DiCarlo briefly asserts that there is no identity of parties because the federal court complaint alleged violation of certain constitutional rights by the City Council, the City's Aviation Department and City's Human Relations Department, while the hearing before the Fairness Board appeals decisions made by the Human Relations Department only. This argument has no merit. We agree with the City that the Aviation Department and the Human Relations Department are departments of the City, not separate entities.

*See Jordan v. Kansas City,* 929 S.W.2d 882, 887 (Mo.App.1996).

**12.** It is apparent that DiCarlo and Dunn see themselves as adversaries in front of the Fairness Board. The Fairness Board's decision to allow Dunn to intervene postured the matter in that regard. To the extent that the Fairness Board proceeds along these lines, the risk of error will increase correspondingly.

S.W.2d 722. In that case, the plaintiff first filed a 42 U.S.C. § 1983 claim in federal court and then filed an appeal with the Civil Service Commission regarding his employment termination. *Id.* at 723. After judgment was rendered in the federal court against the plaintiff, he sought to activate his appeal in front of the Commission. The appeals court upheld a writ of prohibition, based on the claim of *res judicata*, enjoining the Commission from hearing the appeal. The court held that just because the federal action was based on a violation of federal statute 42 U.S.C. § 1983, and the Commission appeal on a City Charter provision, "does not alter the fact that his claim and the transaction from which it arose are identical." *Id.* at 724. Separate legal theories brought under different remedial laws are still the same "cause of action." *See id.* *See also Barkley,* 791 S.W.2d at 913; *King General Contractors,* 821 S.W.2d at 501.

The difference between these two actions, however, is not just that they are based on different legal authorities. Whether the City unconstitutionally treated Dunn differently than DiCarlo is not the issue before the Fairness Board, as it was before the federal court. The extent to which the Human Relations Department followed the authority governing the bidding procedure, with regard to the implementation of the MBE/WBE goal-oriented program, is the issue to be investigated at the Fairness Board hearing. This issue was not determined by the federal court.[13] *See Curnutt v. Scott Melvin Transport, Inc.,* 903 S.W.2d 184, 191 (Mo.App.1995)(holding that *res judicata* does not apply when neither the thing sued for, nor the identity of the cause of action, is the same if it were brought a subsequent suit).

Additionally, the "identity of the thing sued for," is also not present. The relief sought by DiCarlo before the federal court was for injunctive relief and a permanent order enjoining the City from entering into a contract with Dunn, as well as a declarative order commanding the City to reject Dunn's bid and consider DiCarlo's bid. In contrast, DiCarlo asked the Fairness Board for various types of relief including: reversal of the Human Relations Department's determination, a ruling that the bidding process was flawed and unfair to them and the other bidders, and that Dunn be made to stand by its initial MBE/WBE plan submission. Essentially, in the federal action, DiCarlo requested that Dunn's bid be rejected, and that DiCarlo be considered for the contract on the project. DiCarlo is not entitled, however, to seek such relief from the Fairness Board. It may only seek a Fairness Board determination that the bidding process was, or was not, adequately complied with by the Human Relations Department.

All the parties now concede that the Fairness Board does not have the power to command the City to take action, such as to rescind the contract and award it to DiCarlo. Dunn points out that DiCarlo stated, during the June 27, 1997, hearing before the Fairness Board, that it did not want an "advisory opinion" but rather "[w]e want the project awarded to DiCarlo...." Additionally, DiCarlo's notice of appeal to the Fairness Board stated it was appealing the action "of the City Council making the award to J.E. Dunn Construction Company." The appellants concede in their briefs and at oral argument, however, that the Fairness Board does not have the power to effect the decisions of the City Council.

Furthermore, DiCarlo did request, in its Position Paper to the Fairness Board, that the City's Human Relations Department decision be "overruled." The determination of the Human Relations Department, however, has been subsumed by the City Council when it decided to grant Dunn a good faith exemption and then passed the ordinance awarding the Terminal C project contract to Dunn.[14]

---

13. Although a party may not re-litigate an issue when the cumulative grounds could have been brought before the court in the first proceeding, *see King General Contractors,* 821 S.W.2d at 501; *Jordan,* 929 S.W.2d at 887, this issue was not brought before the federal court because the federal court was not the proper vehicle for such a determination. See discussion infra.

14. Although the Disparity Ordinance grants the Fairness Board the power to "hear and decide appeals from the [H]uman [R]elations [D]epartment's decisions" per § 38–100(f), this authority

Once the City Council has acted, the Fairness Board's authority becomes limited to determining whether the Human Relations Department complied with the bid procedure.[15]

DiCarlo sought out the federal path to remedy what it thought was its own mistreatment in the bidding process for the Terminal C construction contract. DiCarlo has now initiated, in front of the Fairness Board, a process to examine the Human Relations Department's compliance with the City's MBE/WBE program.[16] As such, the identity of the thing sued for is not the same. The result is that the federal action does not preclude the proceedings in front of the Fairness Board.

The parties also contest whether the Fairness Board has subject matter jurisdiction to hear DiCarlo's appeal, as DiCarlo is an unsuccessful bidder on a project where the contract has already been awarded to the lowest bidder (Dunn). The appellants claim that the Fairness Board has subject matter jurisdiction pursuant to the Letter Agreement, HRD Form 430 (the Human Relations Department's bid package), as well as the new Disparity Ordinance. During the bid process on the Terminal C project, the Letter Agreement and HRD Form 430 were in effect. It is contested, however, as to whether the Disparity Ordinance governs this matter.[17]

█ Regardless of whether the Human Relations Department's decisions and/or recommendations were made before or after the date the Disparity Ordinance was effective, we find that the Fairness Board has subject matter jurisdiction to hear this appeal. As discussed previously, this is precisely the type of appeal for which the Mayor first created the Fairness Board under the 1991 Letter Agreement. Furthermore, HRD Form 430—contained in the bid packet given to all bidders—consists of instructions regarding the bidders' compliance with the MBE/WBE requirements. HRD Form 430 allows parties to bring appeals before the Fairness Board by indicating that "[i]f bidder is not satisfied with the decision of the Human Relations Department the bidder may appeal to the . . . Fairness Board." [18]

Although "bidder" is not defined in HRD Form 430, the purpose of the Fairness Board is to achieve a fair result with regard to the use of minorities and women in city construction contracts. It is clear that a bidder

does not include overruling Human Relations Department decisions that have been subsequently ratified by City Council action.

**15.** The Fairness Board was created for exactly this type of determination—to check the actions of the Human Relations Department. The Mayor's Letter Agreement, dated December of 1991, stated that the purpose of the Fairness Board was to "maximize participation of all components of the construction industry of Kansas City in construction contracts awarded by [the] City." At that time, the Fairness Board was "charged with the responsibility of overseeing all construction bids, and to determine if good faith efforts have been met on any given bid. . . ." The Disparity Ordinance, which re-authorized the Fairness Board in March of 1996, empowers the Fairness Board to "ensure fair representation in the bidding process by socially and economically disadvantaged persons." Section 38–100. The Fairness Board claims that its role was essentially the same under the Letter Agreement as it is now under the Disparity Ordinance.

**16.** As the Fairness Board understands it, they are being asked to determine: whether the Human Relations Department improperly applied a 48–hour limitation within which an apparent low bidder has to obtain a waiver of the set goals; how the Human Relations Department determines whether a purported minority of women owned business is a bona fide MBE or WBE; and the propriety of the process used by the Human Relations Department to advise the City Council regarding its good faith recommendations.

**17.** The Human Relations Department issued its determination to recommend Dunn's MBE/WBE plan (and approving Dunn as "having made a good faith effort to meet the goals on the project") to City Council on February 29, 1996, and its decision/recommendation was memorialized in memoranda to the City Council dated March 19, 1996. The Disparity Ordinance became effective in between these two events on March 17, 1996. The appellants claim that the Disparity Ordinance governs the Fairness Board's jurisdiction regarding this matter, while the respondents claim that it is not applicable.

**18.** Furthermore, the director of the Human Relations Department testified that on or about February 29, 1996, he notified DiCarlo of their determination and informed DiCarlo that it could appeal the decision to the Fairness Board.

affected by a Human Relations Department decision, regarding the good faith efforts of a successful bidder's MBE/WBE plan, has a right under the Letter Agreement to contest that decision. The typical situation, of course, is an appeal from the apparent lowest bidder who was denied the contract because the Human Relations Department found that they had not made a good faith effort to meet the MBE/WBE goals. Although this is a different factual situation, the purpose of the Fairness Board remains the same—to check the actions of the Human Relations Department. This matter is within the scope of authority of the Fairness Board, whether pursuant to the preceding Letter Agreement, HRD Form 430 or the current Disparity Ordinance.[19]

The result is that we find that the Fairness Board has subject matter jurisdiction. The Letter Agreement (in conjunction with HRD Form 430) and the Disparity Ordinance evidence the City's consistency in granting the Fairness Board the authority to effectuate its overall purpose—to oversee and insure fairness in the process of awarding City construction contracts to minority and women groups.

The respondents, however, contend that the Fairness Board lacks jurisdiction in this matter because it does not have the power or authority to grant the relief requested by DiCarlo and, as such, does not have jurisdiction in this case. *See Scott County Reorganized R–6 School Dist. v. Missouri Comm'n on Human Rights,* 872 S.W.2d 892, 893 (Mo.App.1994)(stating that jurisdiction includes that authority to grant the specific

relief requested). It is unclear to us, based on our review of the record and from the parties' briefs, exactly what DiCarlo is hoping will result from the Fairness Board hearing. All the parties agree, however, that the Fairness Board does not have the authority to alter the decision of the City Council to award the contract for the Terminal C project to Dunn.[20] Since the contract has been awarded, the decision of the Human Relations Department has been supplanted by the City Council and the Fairness Board does not have jurisdiction to reverse or modify that decision, or to adjudicate any dispute between DiCarlo and Dunn.

■ In its brief, the Fairness Board contends that it can make recommendations to the Human Relations Department and the City Council regarding the existing Terminal C project, which includes the authority to demand that Dunn not be allowed to be waived from the WBE participation goals, and to even stop performance on the contract if Dunn fails to comply with the WBE/MBE requirements. We disagree. The relationship between the City and Dunn is now one of contract, and any alteration of that contract is a matter for decision of the parties to that contract, or the courts of general jurisdiction, and not for the Fairness Board. As such, the Fairness Board is limited, postcontract by the City Council, to making instructional rulings as to the bidding process in this instance, and recommendations as to the Human Relations Departments' implementation of the bidding process in the future. As such, the Fairness Board's authority does not encompass the ability to reverse

19. The Disparity Ordinance, while it may or may not govern this matter, is at least illustrative as to the intent of the City Council regarding the role of the Fairness Board. The Letter Agreement created the Fairness Board to "achieve a fairness result," while the Disparity Ordinance, under § 38–100, requires the Fairness Board to "insure fair representation in the bidding process." Section 38–84 of the Disparity Ordinance defines a "bidder" as "any person submitting a competitive bid in response to a solicitation." Furthermore, it contemplates post-contract review, and action, if necessary, under § 38–100(f)(4), by requiring the Fairness Board to hear appeals on "[w]hether appropriate action was taken on complaints or violations of the ordinance or contracts."

20. DiCarlo indicates, in its brief to this court, that "the Board is not being requested to overrule the previous actions by the Operations Committee in recommending [the] award nor the previous action of the City Council." The relief requested "will merely result in the reconsideration by the Operations Committee of its original recommendation in light of the determination and recommendation by the [Fairness] Board ... [the] fact that future approval and action will be necessary by the City Council to carry out a recommendation by the [Fairness] Board to rescind the award to Dunn in no way hinders the [Fairness] Board's ability to review and, if necessary, correct the prior recommendation made by [the Human Relations Department]."

or modify a decision of the Human Relations Department *after* the City Council has acted on that decision.

Finally, the respondents claim that the Fairness Board lacks jurisdiction because DiCarlo's appeal to the Fairness Board was filed untimely. They claim that the clock began to run on February 29, 1996, and that DiCarlo did not file an appeal until May 17, 1996, (over a month after the City Council passed their ordinance awarding the contract to Dunn). They contend that this amount of time was not "reasonable." Since the Fairness Board has been given the authority to create their own rules and regulations, pursuant to § 38–96 of the Disparity Ordinance, we defer to its ruling regarding the "reasonableness" of the time period.

We rule that the Fairness Board has subject matter jurisdiction and the authority to make advisory rulings regarding the bid procedure on the project that is the subject of this litigation, as well as recommendations to the Human Relations Department and the City Council regarding their future implementation of, and compliance with, the MBE/WBE program. In this specific matter, however, the Fairness Board does not have the authority to reverse, modify or overturn the Human Relations Department's decision to approve Dunn's MBE/WBE participation plan.[21] The Absolute Writ of Prohibition terminating the Fairness In Construction Board hearing is quashed and the matter is remanded for further proceedings consistent with this opinion.

HOWARD, P.J., and BRECKENRIDGE, J., concur.

---

**21.** In light of our decision dissolving the writ of prohibition, we have not addressed the appellants contentions that the trial court erred in issuing the Writ of Prohibition based on other grounds such as: (1) no extreme necessity existed, (2) Dunn would·not have suffered irreparable harm, (3) Dunn had an adequate remedy at law, (4) the circuit court did not have subject matter jurisdiction to issue the writ because Dunn had failed to exhaust its administrative remedies, and (5) Dunn and the City waived their right to seek a writ of prohibition because they intervened and participated in the Fairness Board hearing.