**UNITED STATES of America,**

v.

**Jose CRUZ, Defendant.**

**No. 03 CR. 0967(VM).**

United States District Court,
S.D. New York.

April 21, 2004.

Tanya Miller, U.S. Attorney, New York City, for Plaintiff.

Steven M. Statsinger, Federal Defender Division Legal Aid Society, New York City, for Defendant.

## DECISION AND ORDER

MARRERO, District Judge.

Defendant Jose Cruz ("Cruz") has filed a motion to suppress physical evidence seized from his vehicle by two New York City Police Department officers (the "NYPD Officers") during a traffic stop of Cruz's vehicle on April 24, 2003. According to Cruz, the physical evidence that is the subject of his motion was obtained after an unconstitutional search of his vehicle. The Government opposes Cruz's motion and asserts that the NYPD Officers lawfully seized the evidence. The parties appeared before the Court for a suppression hearing on February 5, 2004 to address the factual disputes raised by Cruz's motion. The Court, after having observed and considered the testimony of the parties' witnesses, having reviewed the record on this matter, including Cruz's and the Government's post-hearing papers submitted in support of and in opposition to this motion, finds the testimony of the Government's witnesses to be credible and persuasive on the factual questions raised, and thus, denies Cruz's motion.

## I. BACKGROUND [1]

### A. INTRODUCTION AND PROCEDURAL BACKGROUND

On April 24, 2003, while driving in Bronx County, New York, Cruz was stopped by

---

1. The factual recitation below is derived primarily from the following documents: Indict-

the NYPD Officers for apparent traffic violations. During the stop, the NYPD Officers placed Cruz under arrest after seizing a Panther Model 103 Tazer Stun Gun (the "stun gun") from inside Cruz's vehicle.[2] A subsequent inventory search of the vehicle yielded a ski mask, and a loaded 9mm handgun. Cruz was also found to be in possession of a handcuff key. Based on the seizure of the handgun, a federal grand jury indicted Cruz on a single count of possession of a weapon after having been convicted in any court of a crime punishable for a term of at least one year in violation of 18 U.S.C. § 922(g)(1).

On October 31, 2003, Cruz filed a motion to suppress all the evidence seized during the traffic stop on the basis that the NYPD Officers lacked probable cause to stop his vehicle. In this motion, Cruz contends that he was not driving erratically or otherwise committing a traffic violation at the time he was stopped, and thus, any evidence seized was the result of an unlawful traffic stop.

By letter brief dated November 14, 2003, the Government responded to Cruz's motion and argued that under well-estab- lished law, the NYPD Officers had proba- ble cause to stop Cruz based on the exces- sively tinted windows of Cruz's vehicle.[3] Included in this submission is an affidavit of NYPD Officer Samuel Castro ("Cas- tro"), one of the NYPD Officers involved in the traffic stop of Cruz. Castro attests that he observed Cruz driving erratically mo- ments before stopping him and that the windows of Cruz's vehicle were excessively tinted. (See Castro Aff. at ¶ 3–5.) Thus, the Government's response established that the traffic stop of Cruz was lawful even if there were a dispute as to whether Cruz was in fact driving erratically or had failed to obey a stop sign.

Apparently unable to overcome this le- gal obstacle to his motion to suppress, Cruz sought and obtained from this Court leave to supplement his motion. Cruz's supplemental submission consists of a dec- laration by Cruz that asserts that the stun gun recovered from his vehicle was con- cealed under the driver's seat out of plain view, and was therefore not lawfully seized. (See Cruz Decl. at ¶¶ 5–9.) Thus, according to Cruz, all the evidence seized must be suppressed because it was ob- tained from a warrantless search of his vehicle in violation of the Fourth Amend- ment to the United States Constitution.[4]

ment, *United States v. Jose Cruz*, No. 03 Cr. 0967 (S.D.N.Y.2003); Declaration of Steven M. Statsinger, dated Oct. 31, 2003 ("Statsing- er Decl."); Letter of Tanya F. Miller, dated Nov. 14, 2003 (with attachments); Affidavit of Samuel Castro, dated Nov. 14, 2003 ("Castro Aff."); Letter of Steven Statsinger, dated Dec. 17, 2003; Declaration of Jose Cruz, dated Dec. 16, 2003 ("Cruz Decl."); Government's Response to the Defendant's Motion To Sup- press, dated Jan. 12, 2004; Transcript of Sup- pression Hearing, *United States v. Jose Cruz*, No. 03 CR 0967, Feb. 5, 2004 ("Hearing Tr."); Government's Post–Hearing Brief, dat- ed Mar. 1, 2004; Post–Hearing Memorandum of Law in Support of Jose Cruz's Pretrial Motion To Suppress Evidence, dated Mar. 25, 2004 ("Def.Mem."); Government's Reply to Defendant's Post–Hearing Memorandum of Law, dated Apr. 6, 2004. Except where spe-

cifically referenced, no further citation to these sources will be made.

**2.** Under New York law, it is unlawful to pos- sess a stun gun. *See* N.Y. Penal Law § 265.01(1).

**3.** The New York Vehicle and Traffic Law pro- hibits the operation of a motor vehicle with excessively tinted windows. *See* N.Y. Veh. and Traf. Law § 375(12–a(b)).

**4.** Cruz now concedes that the NYPD Officers had probable cause to stop him and thus, he no longer challenges the legality of the traffic stop. (*See* Transcript of Proceedings, *United States v. Jose Cruz*, No. 03 CR 0967, Dec. 4, 2003, at 4:7–15; 5:4–10.) As will be dis- cussed below, the issue presented with the present motion is narrowed to whether the stun gun seized from Cruz's vehicle was in

In response, the Government counters that the stun gun was in fact in plain view when it was seized by the NYPD Officers, and thus, the subsequent search and seizure of Cruz's person and vehicle were lawful. Recognizing, however, that Cruz's declaration raised a factual dispute, the Government did not oppose Cruz's request for a suppression hearing on the pending motion. On February 5, 2004, the Court held a suppression hearing where the parties proffered witnesses and introduced documentary evidence in support of their respective positions.

## B. *THE SUPPRESSION HEARING*

At the hearing, the Government called NYPD Officer Nicholas DeLuca ("DeLuca"), who was Castro's partner on the day Cruz was pulled over. DeLuca testified that while on patrol in the Bronx on April 24, 2003, he observed Cruz's vehicle, a blue four-door Mazda MPV minivan with dark tinted windows, speeding and failing to make a complete stop at a stop sign. (*See* Hearing Tr. at 5:18–24; 15:7–16:15.) According to DeLuca, Cruz was instructed to shut his car off and exit the vehicle, to which he complied, although DeLuca stated that Cruz appeared nervous, exited his car quickly, and looked back toward his vehicle. (*See id.* at 7:13–20; 19:13–18; 20:8–20.) DeLuca further testified that when Cruz exited his vehicle, his "facial expressions didn't seem consistent with a normal traffic stop." (*Id.* at 20:19–20.)

DeLuca testified that he exited his police vehicle, approached Cruz and frisked him, and brought Cruz to the rear of Cruz's vehicle (between Cruz's vehicle and the police vehicle). (*See id.* at 8:1–17.) According to DeLuca, Cruz was not handcuffed at this point. (*See id.* at 22:3–9.) DeLuca then proceeded to the driver's side of Cruz's vehicle to determine if there were any passengers. DeLuca testified

that to the best of his recollection, the driver's door of Cruz's vehicle was open when he looked inside, although DeLuca recalled that the driver's window was open and the other windows, all heavily tinted, were closed at this time. (*See id.* at 8:19–23; 27:11–28:12; 34:25–35:13; 37:4–6.) DeLuca was not certain, however, whether the car door was open when he looked inside the vehicle. (*See id.* at 35:3–6.)

When asked what he saw when he looked inside Cruz's vehicle, DeLuca responded: "I saw the butt of what could have been a weapon of some sort, a firearm. I wasn't sure what it was." (*Id.* at 9:2–4.) DeLuca recalled that he observed what turned out to be the butt of the stun gun on the floor of the vehicle protruding from underneath the driver's seat. (*See id.* at 9:5–6.) On cross-examination, DeLuca testified that he saw about an inch or more of a black rectangular-shaped plastic material, which he believed may have been a weapon. (*See id.* at 23:1–23.) Upon seeing a portion of what turned out to be the stun gun, DeLuca picked it up, placed it back inside the vehicle, and then informed Castro of what he had found. (*See id.* at 10:9–13; 11:17–24.) Cruz was then placed under arrest. (*See id.* 11:25–12:2.)

DeLuca testified that upon Cruz's arrest, Cruz and his vehicle were taken to the 41st Precinct, where Cruz was processed and where both DeLuca and Castro vouchered and inventoried Cruz's vehicle. (*See id.* at 12:3–25.) DeLuca testified that the purpose of the inventory search is to preserve any potential evidence and to guard against any possible claims of lost property against the NYPD. (*See id.* at 12:17–13:18.) The inventory search of Cruz's vehicle yielded a loaded 9mm handgun and a ski mask. DeLuca testified that the vehicle was inventoried as a result of Cruz's arrest stemming from the stun gun

plain view when the NYPD Officers stopped Cruz.

found inside the vehicle. (*See id.* at 29:9–16.) The Government rested after DeLuca completed his testimony.

As part of his defense case, Cruz first called Melinda Harris ("Harris"), his common-law wife, to rebut some of DeLuca's testimony. Specifically, Harris recounted how she received a call from Cruz on the day of his arrest to ask her to come to the precinct and bring identification. (*See id.* at 43:7–44:15.) According to Harris, Castro informed her at the precinct that Cruz was arrested because his car had been reported stolen and that a stun gun had been found inside the vehicle. (*See id.* at 44:19–45:5.)

Although Harris was not present at the time Cruz was stopped, she testified that she was familiar with Cruz's vehicle and that she was aware that Cruz kept a stun gun underneath the driver's seat. (*See id.* at 45:6–25.) Harris stated that the stun gun could not have slid forward onto the vehicle's floor board because a heating vent under the seat prevented such forward movement. (*See id.* at 46:1–24.)

Harris further testified that based on her knowledge of Cruz's vehicle, the driver's door would not remain open by itself, even when the car was parked on a level surface. (*See id.* at 47:4–21; 53:9–22.) Harris's testimony on this point was elicited to rebut DeLuca's recollection that the driver's door was open when he observed the butt of the stun gun on the floor of the vehicle.

On cross-examination, Harris admitted that she never actually removed the stun gun from under the seat, nor had she ever seen anyone else do so. (*See id.* at 50:2–7; 51:18–25.) The Government also established that because Harris was not present at the time Cruz was stopped, she could not have known exactly where the stun gun was at that time nor what the condition of the floor board was on that day. (*See id.* at 49:6–14.) When asked why

Cruz possessed a stun gun, Harris responded that Cruz kept it for protection after she and Cruz were attacked several years ago. (*See id.* at 50:8–25.)

Cruz next took the stand to recount his recollection of the traffic stop. Cruz testified that when he was stopped, he was on his way home from having some audio equipment installed in his vehicle. Cruz stated that he was stopping at home only to pick up lunch for Harris, and that from there, he was going to work at his job in Manhattan. (*See id.* at 57:4–58:15.)

With regard to the traffic stop, Cruz asserted that he obeyed all traffic laws, namely, that he was not speeding, that he had stopped at the stop sign, and that he properly signaled his turn just prior to the NYPD Officers directing him to stop. (*See id.* at 59:18–60:13.) Cruz testified that at the time he was stopped, the windows in his vehicle were open because of the hot weather. (*See id.* at 62:1–3; 81:7–16.) According to Cruz, he exited his vehicle in a normal manner, raised his hands in the air as instructed, and never looked back, contradicting DeLuca's version of Cruz's reaction. (*See id.* at 62:4–21.) Cruz stated that when he was led to the rear of his vehicle, Castro frisked him and informed him that his vehicle had been reported stolen. (*See id.* at 63:12–64:13; 77:16–23.)

Cruz's next line of testimony raised an issue that had not previously been mentioned by the parties. Cruz testified that DeLuca was not the officer who was present with Castro at the time he was stopped. Rather, Cruz contends that another police officer, not present at the suppression hearing, was Castro's partner on the day in question. Although Cruz could not recall the other officer's name, he described him as: "A male about 28 years old. He had a bald head, an oriental look to him, and he was heavyset." (*Id.* at 64:11–20.) Cruz later stated that this un-

identified officer had a "fair amount of acne on his face." (*Id.* at 84:15–22.) De-Luca, as the Court observed and the parties do not dispute, does not match this description. Indeed, Cruz testified that he had never seen DeLuca until the hearing and that he had only minimal contact with the other police officer on the day of the traffic stop. (*See id.* at 78:8–21; 89:7–90:2.)

Cruz then testified that he was ordered to get on his knees next to the police vehicle and to place his hands on the hood. (*See id.* at 64:22–65:11.) According to Cruz, Castro told him that they were going to check his vehicle to determine whether in fact it was stolen. Cruz testified that at this point the unidentified police officer began to scour through his vehicle. (*See id.* at 65:14–19; 67:11–19.) Cruz then recounted that he was handcuffed and made to sit in the police vehicle with the door open and his legs outside the vehicle. Cruz further testified that after searching through the main compartment of his vehicle, the unidentified officer opened the rear hatch and was "amazed" at the vehicle's sound system. (*See id.* at 66:10–15.)

Cruz stated that the NYPD Officers continued to search his vehicle when Castro informed him that they needed to bring him and his vehicle to the precinct to remove the stolen vehicle report from the police computer. (*See id.* at 68:15–23.) Cruz contends that he was not aware that the stun gun had been found until later that evening while he was at the precinct. (*See id.* at 69:1–9.)

Cruz, like Harris, testified that in the stun gun's usual position behind the heating duct underneath the driver's seat, it is virtually impossible for the butt of the stun gun to protrude from under the seat, especially when the vehicle is on an inclined street facing uphill. (*See id.* at 69:10–70:16.) With regard to whether the front door was open when the unidentified offi-cer approached Cruz's vehicle, Cruz asserted that because his vehicle was stopped facing uphill, it was not possible for the front door to have remained open by itself. Cruz surmised that the other officer must have opened the door at some point in order to conduct the alleged search. (*See id.* at 70:17–71:11.)

On cross-examination, Cruz could not recollect many of the details of his interview with the Bronx Assistant District Attorney (ADA) shortly after his arrest. Specifically, he could not recollect whether he mentioned to the ADA that the NYPD Officers made him go on his knees; he did not recall mentioning the presence of an Asian-looking police officer, or that this officer was amazed at his audio system and was otherwise searching the rear of the vehicle. (*See id.* at 73:16–74:13; 74:25–75:8.) Cruz corroborated Harris's testimony that he had acquired the stun gun for protection in the event of an altercation. Cruz further testified that although he did not know it was illegal to carry a stun gun, he kept it well out of sight underneath the driver's seat. (*See id.* at 75:18–23; 76:14–25.)

Cruz next called Natasha Serrano ("Serrano"), his cousin. Serrano testified that she witnessed the traffic stop of Cruz while walking nearby with her boyfriend and young child. (*See id.* at 93:3–20.) According to Serrano, she saw Cruz drive a few blocks when the NYPD Officers stopped him. When asked if she had observed the police officers who stopped Cruz, she replied: "Not very well. I do know that one of them was bald." (*Id.* at 94:10–11.) When asked if she remembered anything else about the appearance of either police officer, she replied: "No, my vision is not that good from far." (*Id.* at 94:12–19.) Serrano, however, did state that her vision was good enough to determine that one of the officers was bald.

On cross-examination, Serrano admitted that although she witnessed the actual stop, she did not observe Cruz's driving at all times prior to the stop. (*See id.* at 96:13–98:3.) Serrano testified that she was on her way to visit Cruz at his home nearby when she witnessed the traffic stop. During the Government's cross-examination, Serrano marked a photograph of the intersection in question to indicate where she was standing when she allegedly witnessed the NYPD Officers stop Cruz. (*See* GX–1C.) Serrano first stated that the distance from where she was standing to where the traffic stop occurred was a very long block. (*See id.* at 98:20–25.) When Serrano was later questioned by the Court, she testified that the distance was actually two blocks away and despite this distance, she could determine that one of the officers was bald. (*See id.* at 102:14:25.) Serrano testified that she stood observing the traffic stop momentarily and once she observed the police officers reach for their guns, she became concerned for her young child and returned home with her boyfriend, abandoning their plan to visit Cruz. (*See id.* at 101:13–102:9.)

As his final witness, Cruz called Serrano's boyfriend, Luis Flores ("Flores"), with whom Serrano was walking with when she allegedly witnessed the traffic stop of Cruz. (*See id.* at 106:1–10.) Flores indicated that he had never met Cruz before and was on his way to meet him for the first time and to introduce their child to Cruz. (*See id.* at 106:11–16.) According to Flores, he also observed the traffic stop and had observed Cruz obeying all traffic laws in the moments prior to the stop. (*See id.* at 106:24–107:17; 111:19–20.) When asked what he remembered about the appearance of the NYPD Officers, Flores responded that he had a "vague sight of them" but he could recall that one of them was bald. (*See id.* at 107:18–108:1.)

On cross-examination, Flores was asked specifically where he and Serrano were standing when they saw Cruz being stopped. Flores indicated on Government Exhibit 1C the location where he and Serrano were standing at the time of the incident. Flores contradicted Serrano's testimony on this point. Serrano testified that she and Flores never left the corner of Tiffany Street and Spofford Avenue, a location Serrano characterized as a long block away from the traffic stop. (*See id.* at 98:7–9; 98:20–25; 101:10–21; GX–1C.) Flores, on the other hand, testified that he and Serrano continued up Spofford Avenue closer to the traffic stop. (*See id.* at 111:4–112:3; GX–1C.) According to Flores, once he saw the police officers reach for their guns, he became concerned for his son and decided to abandon their plan to visit Cruz. (*See id.* at 117:14–19.) Flores testified that at this point, he and Serrano continued to walk toward Cruz's house to inform Harris of what was transpiring. (*See id.* at 113:19–24; 116:20–117:19.) Flores stated that Cruz was not aware that Flores and Serrano were coming to visit Cruz and that he never got to see Cruz on that day. (*See id.* at 114:3–10; 116:20–117:11.) With the conclusion of Flores's testimony, the defense rested.

In its rebuttal case, the Government called Castro to the stand. Castro corroborated most of DeLuca's testimony regarding the details of the traffic stop. Specifically, Castro testified that he observed Cruz speeding and failing to obey a stop sign just prior to the stop. (*See id.* at 139:2–11; 140:1–3.) Castro recounted that when Cruz was brought between Cruz's vehicle and the police vehicle, Castro began to take his pedigree information while DeLuca walked over to the driver's side door of Cruz's vehicle. (*See id.* at 126:3–18.)

With regard to the stun gun, Castro testified that DeLuca called him over to Cruz's vehicle to see what he had found. Castro's testimony on this detail, which suggests that DeLuca called Castro over to observe the stun gun before DeLuca picked it up, (*see id.* at 127:3–128:9; 147:3–148:20), is at odds with DeLuca's testimony that DeLuca picked up the stun gun and placed it back down before informing Castro what he had found. (*See id.* at 10:9–13; 11:17–24.) Castro could not recall whether he saw DeLuca go into Cruz's vehicle and move the stun gun prior to Castro observing it inside the vehicle. (*See id.* at 154:7–16; 160:8–11.) Castro also suggested that the driver's door was closed and the driver's window rolled down when he looked into Cruz's vehicle and observed the stun gun. (*See id.* at 127:6–20; 143:12–21.)

Although Castro testified that once he placed Cruz under arrest, he sat with Cruz in the back of the police vehicle to obtain some information, Castro could not recall requesting any identification or other driver information from Cruz at the scene. (*See id.* at 129:18–130:1; 144:8–146:1.)

On cross-examination, Castro admitted that while he was obtaining information from Cruz, he was not observing what DeLuca was doing at all times. (*See id.* at 152:1–153:3.) Castro denied ever having Cruz go on his knees nor having him sit with he legs outside the police vehicle. (*See id.* at 129:14–17; 130:2–8.) Finally, Castro testified that DeLuca called for back-up officers to assist with bringing Cruz's vehicle to the precinct and that these officers did not match the description of Cruz's unidentified officer. (*See id.* at 131:20–132:8; 149:58–150:20.)

According to Castro, Cruz's vehicle was not searched at the scene, but rather, was taken back to the precinct by two back-up officers, and it was at the precinct that he and DeLuca performed the inventory search that produced the handgun and ski mask. (*See id.* at 134:15:135:4; 153:4–24; 157:5–9.) Castro denied ever telling Cruz, or anyone else, that Cruz's car had been reported stolen. (*See id.* at 136:4–137:1; 157:23–159:3.)

In response to Cruz's testimony regarding the unidentified "bald" police officer, Castro testified that it was DeLuca who was his partner on that day, and that DeLuca did not match the description of the unidentified officer put forth by Cruz. (*See id.* 137:8–25; 165:3–22.)

When questioned by the Court regarding how Cruz's vehicle was brought to the precinct, Castro testified that back-up police officers were required to drive Cruz's vehicle to the precinct because the police vehicle on the scene did not have a partition between the front and rear seats. Such a partition, according to Castro, would be required if a suspect is going to be left alone in the rear seat while the officers transport him to the precinct. Accordingly, Castro testified that he and DeLuca took Cruz to the precinct in their police vehicle. (*See id.* at 168:11–169:6.)

On this point, the Court subsequently noted that a document included in the Government's mandatory disclosure under the Jencks Act, 18 U.S.C. § 3500, contradicts Castro's testimony that two back-up officers drove Cruz's vehicle to the precinct. Specifically, Exhibit No. 3502–K indicates that DeLuca drove Cruz's vehicle to the precinct while the arresting officer took an inventory of its contents. (*See id.* at 170:17–20; Ex. 3502–K.) The Court determined, however, that this document was prepared by an assistant district attorney after an interview with Castro shortly after the traffic stop, and the information it contained may be inadmissible hearsay. (*See id.* at 170:2–15.)

At the conclusion of the hearing, the Court requested that the Government ob-

tain an official record from the NYPD that indicates who was Castro's partner on April 24, 2003, in an attempt to resolve the mystery of the unidentified police officer Cruz described. Counsel for Cruz did not object to the Court's inquiry. (*See id.* at 172:2–173:4.)

## C. *POST–HEARING SUBMISSION*

A few days after the hearing, the Government submitted an affidavit of Sergeant Atanasie Curumi ("Curumi") in response to the Court's request for official police records as to who was Castro's partner on April 24, 2003. Curumi attests that he was DeLuca's and Castro's direct supervisor at this time. (*See* Affidavit of Atanasie Curumi, dated Feb. 10, 2004 ("Curumi Aff."), at ¶ 1.) Curumi further attests that on April 24, 2003, he performed a daily roll call that confirmed that DeLuca and Castro were indeed partners for the 10 a.m. to 6 p.m. shift. (*See id.* at ¶¶ 2–5.) In support thereof, Curumi attached copies of the precinct's daily roll call and command log, which provide objective, contemporaneous documentation that DeLuca was in fact with Castro when Cruz was stopped. (*See id.* at Exs. A–B.)

## II. *DISCUSSION*

### A. *LEGAL STANDARD*

 The legal basis for Cruz's motion derives from the "fruit of the poisonous tree" doctrine, which holds that evidence obtained as a result of acts in violation of the Fourth Amendment may not be used against a criminal defendant. *See Costello v. United States,* 365 U.S. 265, 280, 81 S.Ct. 534, 5 L.Ed.2d 551 (1961). In general, law enforcement officers first must "obtain advance judicial approval of searches and seizures through the warrant procedure, . . . ." *Terry v. Ohio,* 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (citations omitted). A well-recognized exception to this warrant process for searches

and seizures is the so-called "plain view" doctrine. Under this doctrine, law enforcement officers may lawfully seize evidence without a warrant if: (1) the officer was lawfully in a position to view the evidence; (2) the incriminating nature of the evidence was immediately apparent; and (3) the officer had a lawful right to access the object, *i.e.,* the object was in plain view. *See Minnesota v. Dickerson,* 508 U.S. 366, 375, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993); *United States v. Kiyuyung,* 171 F.3d 78, 83 (2d Cir.1999).

The general premise of the plain view exception is that "police are free to observe whatever may be seen from a place where they are entitled to be." *United States v. Fields,* 113 F.3d 313, 321 (2d Cir.1997) (citing *Florida v. Riley,* 488 U.S. 445, 449, 109 S.Ct. 693, 102 L.Ed.2d 835 (1989)). The Second Circuit has made clear that the exception does not require that the observation of the object in plain view must be inadvertent. *See United States v. Reyes,* 283 F.3d 446, 470 (2d Cir.2002) (stating that the plain view exception operates even if law enforcement officials have a suspicion that the defendant has contraband).

 With regard to the first requirement of the plain view exception, "[t]he determination of lawful vantage point must focus on the activity which brought the object into plain view." *United States v. $557,933.89, More or Less, in United States Funds,* 287 F.3d 66, 81 (2d Cir. 2002). As discussed above, Cruz does not challenge the legality of the traffic stop and thus, it is clear that the first requirement of the plain view exception has been satisfied, namely that the NYPD Officers were lawfully in a position to observe the inside of Cruz's vehicle. *See Horton v. California,* 496 U.S. 128, 136, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990) (stating that an "essential predicate" to the plain view

exception is that the law enforcement officer was not in violation of the Fourth Amendment in being in a position to see the evidence in plain view). The record in this case makes clear that the excessively tinted windows on Cruz's vehicle provided an independent basis upon which the officers had probable cause to stop Cruz, notwithstanding whatever factual dispute exists regarding whether Cruz was speeding or running a stop sign in the moments before he was stopped. Any form of traffic infraction visible to law enforcement officials can provide probable cause to stop a vehicle. *See United States v. Scopo*, 19 F.3d 777, 783–84 (2d Cir.1994).

■ Once an item of an incriminating nature is observed in plain view, police officers have probable cause to arrest a suspect. *See Savino v. City of New York*, 331 F.3d 63, 76 (2d Cir.2003) (stating that "[p]robable cause exists when an officer has 'knowledge ... sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested'") (citation omitted). It is well established that once there has been a valid arrest, police may conduct a warrantless search of a suspect's vehicle incident to that arrest. *See, e.g., United States v. Hensley*, 469 U.S. 221, 235–36, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985); *Scopo*, 19 F.3d at 782; *United States v. Paulino*, 850 F.2d 93, 97–98 (2d Cir.1988); *United States v. Burns*, 684 F.2d 1066, 1073 (2d Cir.1982). Similarly, a warrantless search of a suspect's person may also be conducted incident to a valid arrest consistent with the Fourth Amendment. *See New York v. Belton*, 453 U.S. 454, 457, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981); *Michigan v. DeFil-*

*lippo*, 443 U.S. 31, 35, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979); *United States ex rel. Boucher v. Reincke*, 341 F.2d 977, 980 (2d Cir.1965).

## B. *APPLICATION*

■ Under this framework, the constitutionality of the seizure of the firearm that forms the basis of the charges against Cruz will ultimately turn on whether the stun gun was in plain view when DeLuca approached Cruz's vehicle. More specifically, the primary focus of the Court in ruling on the instant motion will be on the last two requirements of the plain view exception, namely, whether the stun gun was in plain view and whether its incriminating nature was immediately apparent to DeLuca.

In carefully considering the evidence the parties adduced at the suppression hearing, the Court, in order to make an ultimate credibility determination, has carefully weighed the conflicting accounts of the traffic stop given by the various witnesses. After due consideration of all the evidence in the record, including the testimony and demeanor of the witnesses, the Court is persuaded that the stun gun was in plain view when Cruz was stopped.

Although there were some discrepancies in the accounts of DeLuca and Castro regarding the stun gun,[5] collectively, the Court finds the Government's witnesses and documentary evidence to be consistent and credible on the question of whether the stun gun was in plain view. While DeLuca could not recollect whether the driver's door of Cruz's vehicle was open when he observed the butt of the stun gun,

---

**5.** For example, given the discrepancy between DeLuca's and Castro's testimony regarding the sequence of events from the moment DeLuca observed the butt of the stun gun, the Court does not consider whether Castro may have seen the stun gun in plain view. The

Court will grant Cruz the benefit of the doubt and presume that DeLuca did pick up the stun gun when he saw a portion of it. Thus, whatever Castro observed after that point is irrelevant to the question of whether the stun gun was in plain view.

it is undisputed that the driver's window was open and that the other windows were heavily tinted. The dark windows would not have permitted DeLuca to ascertain whether there were any passengers in the rear seats of the vehicle and provided reasonable grounds, as a safety measure, for him to look inside. In so doing, it is not implausible that DeLuca could have viewed the butt from the window even if the door was, in fact, closed when he approached the vehicle.

Moreover, DeLuca testified that he saw an inch or more of what appeared to be a black rectangular plastic object, something he thought might be the butt of a weapon. (*See* Hearing Tr. at 9:2–4; 23:1–23.) According to DeLuca, he would describe the butt of a handgun in the same way. (*See id.* at 33:10:16.) Given DeLuca's seven years of experience as a police officer, it is certainly possible that he could have made this determination by viewing the interior of Cruz's vehicle, whether it was from an open door or an open window. Thus, the Court is persuaded that the incriminating nature of the stun gun was immediately apparent to DeLuca.

Turning to the testimony of Cruz and the other defense witnesses, the Court finds not credible Cruz's "other" police officer theory. Critical to this finding is Curumi's affidavit and supporting documentation that provides strong evidence that DeLuca was Castro's partner at the time Cruz was stopped. Cruz does not challenge the authenticity of these documents, and accordingly, the Court finds them compelling on this question and devastating to Cruz's testimony that DeLuca was not with Castro at the time of the stop.

In his post-hearing brief, Cruz attempts to explain Curumi's affidavit in a footnote by positing that either he, Serrano, and Flores were all honestly mistaken about the bald police officer, or in the alternative, that the officer who testified at the hearing as DeLuca was, in fact, not DeLuca. (*See* Def. Mem. at 3 n. 1.) The Court finds both theories highly implausible and thus, Cruz's explanation is unpersuasive.

The Court also finds critical inconsistencies in the testimony of Serrano and Flores. Specifically, their recollection differed significantly as to how close they were to the traffic stop. Serrano testified that they were one or two long blocks away while Flores testified that they were much closer. Also, they contradicted each other as to where they went after allegedly witnessing the stop—Serrano testifying that they returned home while Flores testifying that they continued to Cruz's home to inform Harris. Moreover, the Court finds implausible their explanation that they decided to make an unannounced visit to show their child to Cruz in the middle of a weekday—the first such visit by Flores—with no knowledge of Cruz's work schedule, and in so doing, coincidentally happened to witness the traffic stop.

The Court further finds suspicious that the only physical attribute that both Serrano and Flores could recall about either police officer was that one of the officers was bald. Serrano testified as such despite admitting that she was at a considerable distance from the traffic stop and that her ability to see distant objects is not very good. Indeed, a review of Government Exhibit 1C, a photograph depicting the intersection where the traffic stop occurred, and on which Serrano marked the spot where she was standing, suggests that Serrano was in fact at a substantial distance away from the traffic stop.

Finally, the Court finds little probative value in Harris's testimony. She was not present at the time of the stop and admitted to never having actually pulled the stun gun out from underneath Cruz's vehicle, or even having seen anyone else do so.

Accordingly, her testimony sheds virtually no light on the question of whether the stun gun was in plain view at the time Cruz was stopped.

The inconsistencies in Serrano's and Flores's testimony, when coupled with Curumi's affidavit that convincingly rebuts Cruz's account that an Asian-looking police officer was Castro's partner, casts serious doubt on the credibility of Cruz, Serrano, and Flores. As the Government points out, were the Court to credit Cruz's account that DeLuca was not Castro's partner on April 24, 2003, it would imply a possible conspiracy by NYPD officers, involving perjury and falsification of official police records. The Court is simply not persuaded that the record here supports a reasonable conclusion that such an astonishing fabrication of evidence has occurred.

 Because the Court finds that the stun gun was in plain view when DeLuca approached Cruz's vehicle, and that the other two requirements of the plain view exception have been satisfied, the Court holds that the NYPD Officers lawfully seized the stun gun and arrested Cruz. Accordingly, the Court finds that the subsequent search and seizure of the firearm and ski mask from Cruz's vehicle,[6] and the search and seizure of the handcuff key from Cruz's person were lawful as incident to Cruz's arrest.

### III. *ORDER*

For the foregoing reasons, it is hereby

**ORDERED** that the motion of defendant Jose Cruz to suppress physical evidence seized from his vehicle and person in connection with his arrest on April 24, 2003 is DENIED.

**SO ORDERED.**

---

6. While Exhibit No. 3502–K directly contradicts DeLuca's and Castro's testimony that back-up police officers drove Cruz's vehicle to the precinct and that the vehicle was searched shortly after its arrival there, the Court grants little weight to this document in light of the fact that it was not prepared by either DeLuca or Castro, and as such represents third-party hearsay statements.